## UNITED STATES v. J. ALLSTON NEWHALL & CO.

(Circuit Court, D. Massachusetts. January 7, 1899.)

### No. 615.

1. CUSTOMS DUTIES—VALUATION OF FOREIGN COINS—BASIS—INTRINSIC OR EXCHANGE VALUE.

In reducing foreign standard coins to United States currency for the assessment of duties, the basis in all cases is the value of the pure metal in such coins, and not their exchange value. This long-established rule was not changed by the proviso to section 25 of the tariff act of 1894 as to reliquidations, where it appeared that the value of the foreign money specified in an invoice had varied at the time of the invoice more than 10 per cent. from that proclaimed by the secretary of the treasury for that quarter; and a collector is not authorized, because the consular certificate accompanying an invoice shows the current exchange value of the money of the invoice to be more than 10 per cent. greater or less than the proclaimed value for the quarter, to depart from such proclaimed value, and adopt, for the purpose of assessing the duty, the exchange value shown by the certificate.

2. SAME—REVIEW OF ACTION OF COLLECTOR.

The action of a collector in declining to accept the proclaimed value of a foreign standard coin, and in adopting another standard, thereby increasing the amount of duty on imported merchandise, does not relate to a disputed appraisement, but to the "amount of duties"; and, under Customs Administrative Act. June 10, 1890, §§ 14, 15, is reviewable, on the protest of the importer, by the board of general appraisers and the circuit court.

This was a petition by the United States for a review of the decision of the board of general appraisers sustaining the protest of J. Allston Newhall & Co. as to the assessment of duties by the collector of Boston on certain imported merchandise.

Boyd B. Jones, for the United States.

J. P. Tucker and Benj. N. Johnson, for respondents.

COLT, Circuit Judge. This is a petition for a review of the decision of the board of general appraisers upon a protest of the importers relating to the amount of duties growing out of the conversion to American money of the silver rupee, in the case of an invoice of 25 bales of tanned sheepskins imported into the port of Boston from Madras, India. In reducing the appraised value of the merchandise to American money, the collector adopted the rate of $.285 per rupee, which was the exchange rate as certified in the consular certificate accompanying the invoice. At the date of the consul's certificate, the value of the rupee, for the purpose of liquidating duties, as estimated by the director of the mint and proclaimed by the secretary of the treasury, was $.233. The board of general appraisers reversed the decision of the collector, and directed him to reliquidate the duties on the basis of the proclaimed value.

The question presented is whether, under the law, in reducing foreign standard coin to United States currency, the value shall be that of the pure metal of such coin, as proclaimed by the secretary of the treasury, or shall be its exchange value.

In the table of estimate of the value of foreign standard coins issued by the director of the mint for the quarter beginning January 1, 1896, we find:

| "Country. | Standard. | Monetary unit. |
|---|---|---|
| India. | Silver. | Rupee. |
| Value in terms of | | Coins. |
| U. S. gold dollar. | | Gold: mohur. |
| .233. | | ($7.10,5) |
| | | Silver: rupee |
| | | and divisions." |

Accompanying this table the secretary of the treasury issued the following:

"Washington, D. C., January 1, 1896.

"The foregoing estimate, by the director of the mint, of the value of foreign coins, I hereby proclaim to be the value of such coins in terms of the money of account of the United States, to be followed in estimating the value of all foreign merchandise exported to the United States on or after January 1, 1896, expressed in any of such metallic currencies."

Attached to the invoice was this consular certificate dated January 11, 1896:

"Certified that the demand rate of exchange on London this day is $1/1$ $31/32$ per rupee, and that the New York demand rate of exchange on London as quoted by Reuter on 10 inst. is 4.89 per pound sterling; the value, therefore, in American gold, of the goods referred to in certified invoice No. 17, is as follows:

Rs. 12076.9.0 at $1/1$ $31/32$—£702.17.10.
£702.17.10 at 4.89      —$3,437.15."

According to this certificate, the value of the silver rupee, in terms of the gold dollar of the United States, is .285.

In expressing in United States money the value of foreign standard coins, it has always been the sound policy of the government to take the intrinsic or pure metal value of such coins. Both the importer and government recognized that it was important to have a fixed and permanent value, though such value might be only approximately true, rather than a fluctuating value, based upon financial quotations in gazettes, trade conditions, or rates of exchange, which would necessarily result in uncertainty, confusion, and interminable litigation.

The first tariff act was enacted July 4, 1789 (1 Stat. 24). On July 31, 1789 (1 Stat. 29), an act was passed to regulate the collection of duties, and section 18 provided that the pound sterling of Great Britain and the coins of other countries designated shall be estimated at the rates specified, "and all other denominations of money in value as near as may be to the said rates."

The acts of August 4, 1790 (1 Stat. 167), and of March 2, 1799 (1 Stat. 627), contained similar provisions. The latter act (section 61) declares:

"And all other denominations of money, in value, as nearly as may be to the said rates, or the intrinsic value thereof, compared with money of the United States."

It also contained the following proviso:

"Provided, that it shall be lawful for the president of the United States, to cause to be established fit and proper regulations for estimating the duties on goods, wares and merchandise imported into the United States, in respect

to which the original cost shall be exhibited in a depreciated currency, issued and circulated under authority of any foreign government."

From 1799 to 1873 there were various acts specifying the value of additional foreign coins, or changing the rate previously established. Previous to 1873 there were three methods of estimating foreign currencies for assessment of duties: (1) For most foreign standard coins, specified rates prescribed by statute; (2) for coins not specifically enumerated in the statute, valuations "as near as may be" to the specified rates or "intrinsic value"; (3) for depreciated currencies issued and circulated under the authority of foreign governments, such valuations as the president might establish by regulations.

By the act of March 3, 1873 (17 Stat. 602; Rev. St. § 3564), instead of separate enactments for each coin, there was substituted a general law, as follows:

"That the value of foreign coin as expressed in the money of account of the United States shall be that of the pure metal of such coin of standard value; and the values of the standard coins in circulation of the various nations of the world shall be estimated annually by the director of the mint, and be proclaimed on the first day of January by the secretary of the treasury."

This act was amended October 1, 1890 (26 Stat. 624), by requiring the estimate by the director of the mint and the proclamation by the secretary to be made quarterly instead of annually. Under this act, the value of foreign standard coins "shall be that of the pure metal," and such value as estimated by the director of the mint, and proclaimed by the secretary of the treasury, has the force of a statute. Collector v. Richards, 23 Wall. 246; Cramer v. Arthur, 102 U. S. 612; Hadden v. Merritt, 115 U. S. 25, 5 Sup. Ct. 1169; U. S. v. Klingenberg, 153 U. S. 93, 14 Sup. Ct. 790.

In Collector v. Richards (pages 257, 259), Mr. Justice Bradley, speaking for the court, said:

"The plain meaning of this language [of act of 1873] is that the value of foreign coins, in United States money, shall be measured by the amount of pure metal contained therein when of standard value; that is, when of the weight and fineness required by the laws and regulations of the country where they are produced. * * * The true method of comparing their money of account with ours, when both are based on actual coin, is to compare the standard coins of the two countries in a perfect state, and to ascertain the actual amount of pure metal in each. This is the result at which congress seems to have arrived, and, as we think, wisely."

In Cramer v. Arthur (pages 619, 620), the same eminent judge said, in the opinion of the court:

"The plaintiff seeks to go behind this valuation, and to show that, at the time of the purchase of the goods, the value of the silver florin in Vienna, as quoted in the papers, and as exhibited by the actual rate of exchange, was less than $47^{60}/_{100}$ cents, namely, $45^{46}/_{100}$ cents, and that the value of the paper florin was $43^{71}/_{100}$ cents. This, we think, the plaintiff cannot be allowed to do. The proclamation of the secretary and the certificate of the consul must be regarded as conclusive. In the estimation of the value of foreign moneys for the purpose of assessing duties, there must be an end to controversy somewhere. When congress fixes the value by a general statute, parties must abide by that. When it fixes the value through the agency of official instrumentalities, devised for the purpose of making a nearer approximation to the actual state of things, they must abide by the values so ascertained. If the currency is a standard one, based on coin, the secretary's

proclamation fixes it; if it is a depreciated currency, the parties may have the benefit of a consular certificate. To go behind these, and allow an examination by affidavits in every case, would put the assessment of duties at sea. It would create utter confusion and uncertainty. * * * It is of the utmost consequence to the government, and it is, on the whole, most beneficial to importers, that the value of foreign moneys should be officially ascertained, and that they should be fixed by a uniform method or rule."

In Hadden v. Merritt the court (115 U. S. 27, 5 Sup. Ct. 1170) said:

"The value of foreign coins, as ascertained by the estimate of the director of the mint and proclaimed by the secretary of the treasury, is conclusive upon custom-house officers and importers. * * * There is no value, and can be none, in such coins, except as thus ascertained."

From the origin of the government down to the passage of section 25 of the tariff act of August 27, 1894 (28 Stat. 552), the value of foreign standard coins, for the purpose of liquidating duties, was based upon their intrinsic or pure metal value, as expressed in the money of account of the United States. The method adopted previous to 1873 was by special enactment fixing the value as to certain specified coins, and by treasury regulations as to nonenumerated coins to ascertain "as near as may be" the intrinsic value, and since 1873 by estimate of the director of the mint, and proclaimed by the secretary of the treasury. The only exception was in the case of a depreciated currency issued and circulated under authority of any foreign government, which, by the act of 1799 (now section 2903 of the Revised Statutes), was subject to regulations established by the president. As to depreciated currency, it was early directed by the president that the consular certificates of value annexed to the invoices should govern. Section 25 of the tariff act of 1894 reads as follows:

"That the value of foreign coin as expressed in the money of account of the United States shall be that of the pure metal of such coin of standard value; and the values of the standard coins in circulation of the various nations of the world shall be estimated quarterly by the director of the mint, and be proclaimed by the secretary of the treasury immediately after the passage of this act and thereafter quarterly on the first day of January, April, July, and October in each year. And the values so proclaimed shall be followed in estimating the value of all foreign merchandise exported to the United States during the quarter for which the value is proclaimed, and the date of the consular certification of any invoice shall, for the purposes of this section, be considered the date of exportation: provided, that the secretary of the treasury may order the reliquidation of any entry at a different value, whenever satisfactory evidence shall be produced to him showing that the value in United States currency of the foreign money specified in the invoice was, at the date of certification, at least 10 per centum more or less than the value proclaimed during the quarter in which the consular certification occurred."

This section, until we reach the proviso, is substantially a re-enactment of the previous law. The contention of the government rests upon the proposition that the word "value" in the proviso is not limited to the value "of the pure metal," but extends to other methods of valuation never before adopted with respect to specified foreign standard coins. To adopt this construction is to hold that congress intended to depart from the long-established rule, and to introduce a new and uncertain mode of valuation in cases coming within the terms of the proviso. The result is that the body of the section provides one way, and one way only, for estimating the value of foreign standard coins,

while the proviso covers other ways in conflict with former well-settled principles. Certainly the court should not adopt such a construction, if it be at all doubtful. To hold that, where the value of the foreign coin during the quarter varies less than 10 per centum from the value proclaimed, the pure metal value is to govern, and that when it exceeds 10 per centum the secretary of the treasury may adopt any standard of valuation he sees fit, based upon rate of exchange, trade conditions, or financial reports, would result in the introduction of those elements of uncertainty and confusion which the law has aimed especially to prevent. The purpose of the proviso, in our opinion, was not to change the principle in estimating the value of foreign coins, but rather to permit of a different estimate on the same principle, if it should appear at any time during the quarter that the proclaimed value was to a considerable degree at variance with the actual fact existing at the time of any given importation. While the standard of valuation should be fixed and based on intrinsic value, the whole legislation on this subject shows an effort on the part of congress to provide speedier means for correcting the valuation when it is shown to be wrong. Until 1873 any change in the valuation of specified foreign standard coin required a special enactment. By the statute of 1873 the proclaimed estimate must be made annually. By the statute of 1890 it must be promulgated quarterly. The proviso, in section 25 of the act of 1894, was simply another step in the same direction, and was intended to permit a new estimate of valuation at any time during the quarter where there was found to be an error of at least 10 per centum. This is the natural construction and evident intent of the whole section, and is in harmony with previous legislation. The proviso must be considered in connection with the body of the section and the subject-matter to which it relates. Under a familiar principle of statutory construction, a proviso is to be strictly construed, and it "takes no case out of the enacting clause which does not fall fairly within its terms." U. S. v. Dickson, 15 Pet. 141, 165. This proviso has reference to the subject-matter treated in the body of the section, and any broad construction of the word "value," which should enlarge its scope as therein defined, would be doing violence to every sound rule of statutory construction, and is contrary to the general context of the proviso itself, taken as a whole and in connection with what precedes. It would introduce confusion and inconsistency into a statute which is otherwise plain and intelligible.

In this case the value of the rupee, as estimated by the director of the mint and proclaimed by the secretary of the treasury, was fixed at $.233 for the quarter beginning January 1, 1896. The date of the consular certificate attached to the invoice was January 11, 1896, and the value of the rupee in exchange, as therein certified, was equal to $.285. This represents an appreciation of 23 per cent. over the proclaimed value, and therefore comes within the terms of the provisio; and the collector was right in the action he took if the word "value" in the proviso should be construed to mean value in exchange, or any other standard of value except that "of the pure metal." We hold that the proviso must be limited to the subject-matter treated in the body of the section, and therefore that it is only applicable to those cases

91 F.—34

.where "satisfactory evidence" is produced that the value of the pure metal of such foreign coin has either appreciated or declined 10 per cent. as compared with its proclaimed value. As there is no evidence on this point in this case, the proclaimed value must stand, and the collector'should have liquidated the duties on that basis.

We understand, from the brief of counsel and the later instructions of the treasury department, that the government relies mainly on the proviso in section 25 for justification of the collector's action. In two letters, however, to the collector, bearing date, respectively, May 12, and June 17, 1896, in reply to an inquiry for instructions, the secretary of the treasury says that the rupee must be regarded as a depreciated currency, upon the ground, apparently, that its nominal value, as he states, is $.444, and that, therefore, entries of merchandise covered by invoices made out in such currency should be liquidated at the value certified by the consul. There seems to be nothing in the facts of the case which warrant the treatment of the silver rupee at the time of this importation as a depreciated currency, under the law. The provision respecting depreciated currency first appears in the proviso of the sixty-first section of the act of 1799. "This proviso has always continued in force, and now constitutes section 2903 of the Revised Statutes." Cramer v. Arthur, 102 U. S. 612, 617. Speaking of this proviso, Mr. Justice Bradley said (page 618), in that case:

"It was passed at a time when the nations of Europe were at war and the United States were neutral. In England and France, and perhaps other countries, specie payments had been suspended, and currencies based on government credit had been adopted. The law seems to have had in view artificial money of this kind; a depreciated currency, not based on specie, but still 'issued and circulated under authority of the government.'"

The president, acting through the secretary of the treasury, has established regulations on the subject. The treasury regulations (Ed. 1874, art. 993, as amended by circular, S. S. 1870) were as follows:

"First. Where the standard value of a foreign currency has been proclaimed by the secretary of the treasury in the manner provided by law, or, not having been so proclaimed, has been fixed by special enactment, that value is to be taken in all cases in estimating customs duties, unless collectors have been otherwise instructed, or unless a depreciation of the value of the foreign currency expressed in an invoice from the standard of that currency shall be shown by consular certificate thereto attached. Secondly. Where the standard value of a foreign currency has not been proclaimed by the secretary of the treasury, in the manner provided by law, an invoice expressed in such currency must be accompanied by a consular certificate, showing its value in standard gold dollars of the United States."

In 1891 the provision was amended as to depreciated currency (S. S. 11,661) so as to read:

"If that currency be depreciated, each copy of the invoice should be accompanied by a consular certificate (Form No. 144) stating the precentage of depreciation of the currency actually paid as compared with the corresponding standard coin currency, and the value in such standard coin currency of the total amount of the depreciated currency paid for the merchandise mentioned in the invoice."

Form No. 144 is as follows:

"I, ——, consul of the U. S. of America. do hereby certify that the true value of the currency of the —— of ——, in which currency the annexed

invoice of merchandise is made out, is —— per cent. as compared with the corresponding standard coin currency, and that the value in such standard coin currency of the total amount of the currency actually paid for the merchandise is ——."

In this case the consular certificate was not in the form required for a depreciated currency. So far as appears, the rupee was not treated as a depreciated currency coming under the regulations of the president, as provided in section 2903, and which calls for a particular form of consular certificate. On the contrary, on January 1, 1896, the value of the silver rupee in money of the United States was fixed, for the three months following, by estimate of the director of the mint, and so proclaimed by the secretary of the treasury, as provided in section 25 of the act of August 27, 1894. There is no evidence in this record that at the date of the importation the silver rupee was other than a foreign standard coin of India, and so coming under section 25. To say that a currency was depreciated when its value, as certified by consular certificate, was more than 20 per cent. greater than its proclaimed value, would seem an unwarranted construction of section 2903, as it has always been interpreted.

The second question raised by the government under the assignment of errors is that the board of general appraisers had no jurisdiction to review the action of the collector in estimating the value in United States money of foreign coin. This case is not one of disputed appraisement of the value of imported merchandise, as to which the decision of the board of general appraisers is made final under section 13 of the customs administrative act of June 10, 1890. U. S. v. Klingenberg, 153 U. S. 93, 102, 14 Sup. Ct. 790; Hilton v. Merritt, 110 U. S. 97, 3 Sup. Ct. 548. The dutiable value in rupees of the merchandise in this case is admitted under the agreed statement of facts; the only issue being whether this court or the board of general appraisers has jurisdiction to review the action of the collector in reducing to United States currency the value of the rupees. Such jurisdiction, if any, must be found in sections 14 and 15 of the act of June 10, 1890. The jurisdiction conferred upon the circuit court by section 15 is co-extensive with the jurisdiction conferred on the board of general appraisers by section 14. This was so held by the supreme court in the Klingenberg Case, 153 U. S. 93, 14 Sup. Ct. 790, in the following words:

"The subjects of review by the circuit court, provided for by section 15, extend to all questions of law and fact in respect to which the board of general appraisers have appellate jurisdiction, except the decision of that board as to the dutiable value of merchandise, which is provided for by section 13, and is made conclusive against all parties interested."

In construing section 14, the court says:

"By section 14 the collector's decision on rate and amount of duties, including all dutiable costs and charges, and as to all fees and exactions of whatever character (except duties on tonnage), may be the subject of appeal to the board of general appraisers."

The Klingenberg Case decided that where the collector was simply called upon, under the statute, to follow the estimate of value made by the director of the mint, and proclaimed by the secretary of the treasury, his action was not subject to review by the board of general appraisers. If, for example, in the present case, the collector had adopted

the proclaimed rate for the rupee on January 1, 1896, of $.233, his decision would have been final. This conclusion of the court was based upon the rule laid down in Collector v. Richards, Cramer v. Arthur, and Hadden v. Merritt, ubi supra. These authorities show the absolute conclusiveness of the value estimated by the director of the mint and proclaimed by the secretary of the treasury of the standard coin of foreign countries. After holding that the collector's construction of the value as proclaimed was correct, the court said:

"This being the proper construction to be placed upon the proclamation of July 1, 1892, we are of opinion that the collector's action in adopting the value of the gold florin at the estimate fixed therein was not subject to review by the board of general appraisers, under the principle laid down in the authorities already referred to."

All the Klingenberg Case decided was that when the collector followed such proclaimed value his action was not the subject of appeal, under section 14. The present case is the reverse, for here the collector refused to be governed by the proclaimed value.

As was said by the circuit court of appeals for the Second circuit, speaking through Judge Sherman, in the case of Wood v. U. S. (1896) 18 C. C. A. 553, 72 Fed. 254, in which the question arose whether the collector should liquidate the duties according to the value of the silver ruble proclaimed October 1, 1891, or according to the value proclaimed January 1, 1892:

"In the Klingenberg Case the collector was simply called upon by the statute to follow the estimate made by the director of the mint, and proclaimed by the secretary of the treasury, and his action was not the subject of reversal. In this case the collector was compelled to construe the statutes, and determine which proclamation he should observe. The Klingenberg Case is not an authority in favor of the proposition that an act of the collector in regard to valuation of foreign coins which is or which may be in violation of the statutes cannot be the subject of review or of reversal by the board of general appraisers. On the contrary, the opinion asserts that, by section 14 of the customs administrative act of June 10, 1890, 'if the decision of the collector imposes an excessive amount of duties, under an improper construction of the law, the importer may take an appeal to the board of general appraisers, whose decision on such questions is not made conclusive, as it is in respect to the dutiable value of the merchandise, and, not being conclusive, is subject to review [by the circuit court] under the express provisions of section 15.' "

The question in this case has reference to the "amount of duties," and is therefore reviewable, under sections 14 and 15 of the act of June 10, 1890, by the board of general appraisers and by the circuit court. The amount of duties liquidated at the proclaimed value of the rupee would have been less than the amount liquidated at the exchange value. The Klingenberg Case is not an authority upon the proposition that where the collector declines to accept the proclaimed value of a foreign standard coin, and adopts another standard, thereby increasing the amount of duties upon imported merchandise, his action is not the subject of review, under the act of 1890. Our conclusion is that the board of general appraisers and this court have jurisdiction, and that the decision of the board reversing the action of the collector should be affirmed. The decision of the board of general appraisers is affirmed.