### UNITED STATES v. LUCIUS BEEBE & SONS.

(Circuit Court of Appeals, First Circuit. March 10, 1903.)

No. 452.

1. CUSTOMS DUTIES—VALUATION OF FOREIGN MONEY—AUTHORITY OF SECRETARY TO ORDER RELIQUIDATION.

The reason for the proviso to section 25 of the tariff act of August 27, 1894, 28 Stat. 552, c. 349 [U. S. Comp. St. 1901, p. 2375], which authorizes the Secretary of the Treasury to order the reliquidation of any entry at a different value, on satisfactory evidence to him that "the value in United States currency of the foreign money specified in the invoice was at the date of certification at least ten per centum more or less" than the

value proclaimed during the quarter as required by such section, is to be found in the numerous violent fluctuations in the market value of silver which had taken place during the preceding two years; and construing the proviso in accordance with the rules that the reason of a statute is to be taken into account, and that, in general, a proviso carves special exceptions only out of the body of the act, the word "money," as used therein, must be construed to mean "coin," upon the bullion value of which the quarterly proclamations provided for by the preceding part of the section are based, and the proviso does not authorize the Secretary to order the reliquidation of an entry because the currency or legal-tender value of the Indian rupee, in which the invoice value was expressed, is more or less, by more than 10 per centum, than the bullion value as fixed by the proclamation, based on the market value of the silver coins which constitute the only money of account in India expressed in rupees.

2. SAME—JURISDICTION OF BOARD OF GENERAL APPRAISERS—"DECISION" OF COLLECTOR.

Under section 14 of the customs administrative act of June 10, 1890, 26 Stat. 137, c. 407 [U. S. Comp. St. 1901, p. 1933], which confers upon the board of general appraisers power to review decisions of the collector, the board had jurisdiction to review the action of the collector in reliquidating the entry in this case, although it was done pursuant to an order of the Secretary of the Treasury.

Appeal from the Circuit Court of the United States for the District of Massachusetts.

For opinion below, see 117 Fed. 670.

Henry P. Moulton, U. S. Atty., and William H. Garland, Asst. U. S. Atty.

William R. Sears (Whipple, Sears & Ogden, on the brief), for appellees.

Before PUTNAM, Circuit Judge, and ALDRICH and BROWN, District Judges.

PUTNAM, Circuit Judge. This is an appeal from a decision of the Circuit Court in a customs case, made in accordance with section 15 of an act entitled "An act to simplify the laws in relation to the collection of revenues," approved June 10, 1890, c. 407 (26 Stat. 138). The decision of the Circuit Court was in favor of the importers, and the United States appealed.

The case turns on the construction of section 25 of the act which went into effect August 27, 1894, entitled "An act to reduce taxation, to provide revenue for the government, and for other purposes." Chapter 349, 28 Stat. 552 [U. S. Comp. St. 1901, p. 2375]. That is as follows:

"Sec. 25. That the value of foreign coin as expressed in the money of account of the United States shall be that of the pure metal of such coin of standard value; and the values of the standard coins in circulation of the various nations of the world shall be estimated quarterly by the director of the mint, and be proclaimed by the Secretary of the Treasury immediately after the passage of this act and thereafter quarterly on the first day of January, April, July and October in each year. And the values so proclaimed shall be followed in estimating the value of all foreign merchandise exported to the United States during the quarter for which the value is proclaimed, and the date of the consular certification of any invoice shall, for the purposes of this section, be considered the date of exportation: provided, that the Secretary of the Treasury may order the reliquidation of any entry at a different value, whenever satisfactory evidence shall be produced to him

showing that the value in United States currency of the foreign money specified in the invoice was, at the date of certification, at least ten per centum more or less than the value proclaimed during the quarter in which the consular certification occurred."

All the questions involved in this appeal turn on the rules of statutory construction, and the application thereof. The learned judge of the Circuit Court considered them all carefully. So far as they are not discussed in this opinion, his reasoning and conclusions are accepted by us, and need no addition nor explanation. The main question arises in the following manner:

The importations in issue were of merchandise purchased at Calcutta, and invoiced there in rupees in August, 1898. The bullion value of the rupee at that time, in accordance with the tabulation of the director of the mint provided by law, was 19 cents and 9 mills, while its market value at Calcutta, and its value then and there as currency, was 32 cents 1 mill and one-tenth of a mill, being an appreciation of over 60 per cent. This came about in a way quite unexampled in the history of foreign currencies with which the United States have had to deal, and subsequently to the act of 1894.

As is well known, the historical currency of India is in silver rupees, which have there been legal tender for a long period. The only gold currency known there in matters of account with foreign peoples is the English sovereign. The rupee had been the principal coin, and the sovereign the exceptional one. Previous to June, 1893, the mints of India had been bound by law to the free public coinage of silver into rupees, and therefore the rupee circulated at its bullion value. The legislation of that date closed the mints. For a time thereafter, however, the rupee continued to fall as its bullion value decreased. But it subsequently rose in value, and since January, 1898 (being the year in which the merchandise in question was invoiced), it has been practically stable in mercantile transactions at 32 cents 1 mill and one-tenth of a mill. In 1899, by legislation, the British sovereign was made legal tender in India at the ratio of 15 rupees to the sovereign; thus permanently fixing the currency value of the rupee at substantially the figure which it reached in 1898.

Thus it will be seen that the silver rupee, like our silver dollar, had at the time this merchandise was invoiced a practical value as legal tender far in excess of the bullion value at which, according to law, it was rated by the director of the mint; and these changes in value of the rupee accrued after the act of 1894 went into effect. Previous to that act there were no differences with regard to the rupee of the character which we have described as existing in 1898. The prior differences were such as arose from fluctuations of the marketable price of silver. These, except in case of violent changes, would have been approximately and sufficiently provided for by the quarterly determinations of the director of the mint. But the fluctuations of the bullion value of the rupee, corresponding to the fluctuations of the market value of silver, were rapid and numerous about and just prior to the passage of the act of 1894. It is true that there had been for some years prior to 1892 a gradual diminution in the market value of silver; but during 1892, 1893, and 1894, it lost fully 50 per cent., so that, while its commercial ratio with reference to gold

was represented in 1891 by 20.92, in 1894 it was represented by 32.56. Without going into the details of these fluctuations, it is apparent that at times they must have been violent during the periods prescribed by law for the director of the mint. Indeed, in 1893, for some single calendar months, they were more than 20 per cent. of the bullion value of the rupee.

Of course, importations from every country where the basis of the currency was a silver coinage were involved in the same difficulties, growing out of the rapid fluctuations of bullion values immediately prior to the passage of the act of 1894, as those described in connection with the Indian rupee. It is not necessary, however, to go into details of other foreign currencies, or to describe the extent to which they affected the mass of importations, because it is apparent from what we have already said that there was ample occasion for the legislation of 1894 in question in the fluctuations of the bullion value of silver, and therefore no necessity for looking for other inducements thereto.

The question which we have to consider is whether section 25 of the act of 1894 is to be regarded as satisfied by having reference to the state of things existing when it was passed; that is to say, the violent fluctuations in the marketable value of silver, and correspondingly in the bullion value of rupees, which marked that period, or whether it is to be construed so as to cover subsequent differences between the intrinsic worth of the rupee and its worth as legal tender and as money of account. In other words, claiming to proceed under the authority of the proviso in section 25, the Secretary of the Treasury ordered the reliquidation of the entries of this merchandise without regard to pure-metal values, and based on the legal-tender value of the rupee at 32.11; and the question is whether, as a matter of law, this was justified thereby.

Prior to the act of March 3, 1873, c. 268 (17 Stat. 602), as well observed in the opinion of the learned judge of the Circuit Court, the values of foreign coins for customs purposes were fixed arbitrarily at different times by different statutes; each statute relating to one or more coins. The first section of that act reads as follows:

"That the value of foreign coin as expressed in the money of account of the United States shall be that of the pure metal of such coin of standard value; and the values of the standard coins in circulation of the various nations of the world shall be estimated annually by the director of the mint, and be proclaimed on the first day of January by the Secretary of the Treasury."

The law conformed to the letter of this provision of statute until the act of 1894 in question here, though modified to require quarterly estimates. This act, being a revenue bill, originated in the House, which gave passage to the first portion of section 25 therein; repeating, with the modification of "quarterly" instead of "annually," the phraseology of the act of March 3, 1873, and containing nothing more. The balance of the section, as it now stands, was incorporated into it by the Senate on the recommendation of its finance committee; but no explanation thereof can be found in any report of that committee, or in the debates in the Senate or the House.

Under these circumstances, several rules of construction have been

pressed on us as solving the question before us, but none of them are of commanding force. In fact, since legislation has grown to such enormous proportions, the intent is sought for without controlling regard for artificial rules. This has gone so far that even the notion of legislative omniscience, formerly adhered to so strictly that every word was assumed to have a significance of its own, has broken down, so that Congress is now admitted to express itself tauto-logically. Pirie v. Chicago Title Company, 182 U. S. 438, 444, 21 Sup. Ct. 906, 45 L. Ed. 1171. With this has disappeared the last of all of the rules, in the sense that any undertook to put the courts under subjection with regard to the construction of statutes. In like manner, there has been a modification in the application of the old rule that a proviso in a section of a statute must be accepted as carved out of the principal matter thereof. Nevertheless the rule is of value, and it certainly has weight in the case at bar.

But where the language of a statute is so doubtful as to require and permit construction, the most natural, and therefore the most persuasive, rules are, first, the fifth given by Blackstone, following Lord Coke, that "the most universal and effectual way of discovering the true meaning of a law, when the words are dubious, is by consid-ering the reason and spirit of it, or the cause which moved the Legis-lature to enact it." Commentaries, vol. 1, p. 61. The second is the unavoidable rule that "where a particular construction of a statute will occasion great inconvenience, or produce inequality and injustice, that view is to be avoided if another and more reasonable interpreta-tion is present in the statute." Knowlton v. Moore, 178 U. S. 41, 77, 20 Sup. Ct. 747, 44 L. Ed. 969. The first of those is the safer, because it is the universal rule of interpretation, applied to every instrument, that whosoever assumes to construe it must put himself in the position of the parties at the time the instrument was executed; and the application of the second involves a determination of incon-veniences, inequalities, and injustices, the apparent proportions of which experience shows vary extremely according to the tribunals attempting to weigh such elements, and more especially according to the times when the attempts are made. This rule, therefore, is peculiarly subject to the remark of the Supreme Court, many times repeated, "that no mere omission, no mere failure to provide for con-tingencies which it may seem wise to have specifically provided for, justify any judicial addition to the language of the statute." Pirie v. Chicago Title Company, 182 U. S. 438, 21 Sup. Ct. 906, 45 L. Ed. 1171, ubi supra, at page 452, 182 U. S., page 912, 21 Sup. Ct., and 45 L. Ed. 1171.

A striking illustration of the force of the primary rule that, in order to interpret a doubtful instrument or statute, it is necessary to put one's self in a position contemporaneous therewith, is found in connection with the fourteenth amendment. That contained clear expressions, in positive language, so that its application, in the end, proved to be very broad. With reference to all the articles of amend-ment subsequent to the War of the Rebellion, the Supreme Court said in Slaughter-House Cases, 16 Wall. 36, 72, 21 L. Ed. 394, "Both the language and the spirit of these articles are to have their fair and

just weight in any question of construction." But having already observed that all of them were especially addressed to the grievances of the colored race, it added, in limitation of what we have already quoted, as follows:

"But what we do say, and what we wish to be understood, is that, in any fair and just construction of any section or phrase of these amendments, it is necessary to look to the purpose which we have said was the pervading spirit of them all, the evil which they were designed to remedy, and the process of continued addition to the Constitution, until that purpose was supposed to be accomplished, as far as constitutional law can accomplish it."

If the phraseology of the statute which we now have under construction contained clear and positive expressions, analogous, in this respect, to the fourteenth amendment, we might be obliged, notwithstanding the peculiar circumstances under which the statute was enacted, to give it a sweeping application, altogether beyond those circumstances, but such is not the fact. If the proviso, instead of using the word "money," had used the word "coin," which appears at the opening of section 25, the statute would be clear, and there could be no question that the construction claimed by the importers should be given to it; yet the interposition of the word "money" in lieu of the word "coin," especially in view of the method, already explained, in which the section was added to after it passed the House, is far from indicating that there was any legislative intention of using one word in any different sense from that in which the other is necessarily understood.

Conforming to the statute, these invoices were expressed in the currency "actually paid for the merchandise by the purchaser." Act June 10, 1890, c. 407, § 3 (26 Stat. 131). As, when the invoices in issue were made, there was no money of account in India expressed in rupees, other than the silver rupee, it follows that in this particular case "the foreign money specified in the invoice" called for by the proviso in section 25 was the silver rupee, so that even if, under some circumstances, the word "money," in that proviso, could theoretically be construed as meaning anything else than "coin," it cannot mean anything else with reference to the particular case with which we have to deal. Moreover, in accordance with settled usage, Webster's Unabridged Dictionary gives as the first definition of "money" "coin, stamped metal," although the secondary meaning of the word is said to include "any currency usually and lawfully employed in buying and selling as the equivalent of money."

Here, therefore, arises the doubt as to the true construction of the statute in question. For solving this doubt, we have no suggestions in the congressional proceedings, which are often of use as such. We have, for what it is worth, the rule to which we have referred with regard to the construction of provisos. This undoubtedly weighs in favor of the importers, as was stated by the learned judge in the Circuit Court, and as this aid to construction was explained in United States v. Dickson, 15 Pet. 141, 165, 10 L. Ed. 689, and repeated in Ryan v. Carter, 93 U. S. 78, 83, 23 L. Ed. 807. That was to the effect that the general rule is "that a proviso carves special exceptions only out of the body of the act." So much of that portion of

section 25 which came in by amendment in the Senate as precedes the proviso was clearly expressed to change the law with reference to the time at which the value of foreign coins is to be ascertained. Heinemann v. Arthur's Executors, 120 U. S. 82, 85, 7 Sup. Ct. 446, 30 L. Ed. 605. But the use of the word "money" in the proviso, in lieu of the word "coin" in the earlier part of the section, cannot, in any view, be held as of so decisive a character as to avoid the application of the rule of construction last referred to, even under the modern practice with reference to all such rules.

The reason for this proviso can be suggested only by the fact of the numerous violent fluctuations in the market value of silver, and in the corresponding market value of rupees, which we have fully explained, and this brings us under the leadership of the safest guide for the construction of a statute, already referred to; that is, the consideration of the causes which moved the Legislature. The circumstance that the legal-tender value of the rupee far exceeded its bullion value, which is now presented, did not exist when the act of 1894 was passed, and it could not have been in the contemplation of Congress. In fact, it may be said never to have previously existed, so far as known to our customs system. Some trace of it is indicated in the circulating money of Puerto Rico in February, 1895. Circular letter from the Acting Secretary of the Treasury, Synopsis of Treasury Decisions, 15,606. It there appears that, on account of the prohibition of the importation of Mexican dollars into Puerto Rico, those dollars had in that island in February, 1895, a value greater than that of the pure silver contained therein. The circular says that the department had been so advised by the director of the mint; and its whole tenor leads to the inference that it was a fact which had either just been developed, or was then first brought to the attention of the United States. Therefore this fact not only succeeded the legislation in question, but it was a comparatively minor one, while the violent fluctuations of silver affected the entire commercial world; and it cannot reasonably be doubted that the purpose of Congress in section 25, under consideration, was with reference thereto. As that purpose is clearly accomplished, it is not necessary to strain a doubtful expression to meet the issue before us.

Two minor considerations strengthen this view of the statute: First, the Treasury Department, when everything was fresh, and the circumstances under which the legislation of 1894 was enacted must have been known, made no pretense to give the construction to this statute which the United States now assert. It met the Puerto Rico difficulty, as is shown by the circular letter of February, 1895, by reference solely to section 2903 of the Revised Statutes [U. S. Comp. St. 1901, p. 1922], providing especial relief as to duties on merchandise the original cost of which was in a depreciated currency. This view was re-enforced by a letter from the Acting Secretary of the Treasury to the Collector of Customs at Boston, of May 8, 1895. Synopsis of Decisions, 16,037. Indeed, it is apparent from the record in the case, and from the opinion of the learned judge in the Circuit Court in United States v. Newhall, 91 Fed. 525, that even then the same position was taken by the department, enforced by its letter to

the collector of customs at Boston of May 12, 1896. While this construction of this statute by the Treasury did not continue for so long a period that it has direct weight under the ordinary rule with reference to the practical effect given to legislation by the executive departments, yet it supports strongly the proposition which we have sought to make clear—that the historical circumstances out of which the legislation arose, and which it had in contemplation, were not of the character presented by the case at bar.

Further, it is to be considered that section 2903 of the Revised Statutes cannot be held to have been repealed by section 25 of the act of 1894. That it was not so repealed by the act of 1873, to which we have referred, was clearly assumed in The Collector v. Richards, 23 Wall. 246, 23 L. Ed. 95, and apparently so held in Cramer v. Arthur, 102 U. S. 612, 26 L. Ed. 259. That the Treasury Department regards section 2903 as still in force is apparent from Customs Regulations 1899, art. 409, which continues to provide for proper proceedings thereunder. Inasmuch as section 25 applies not only when there is an appreciated currency, but also when there is a depreciated one, using the words "more or less," it would follow that, if the present position of the United States is correct, there would be, with reference to depreciated paper currency, two radically distinct and inconsistent methods of liquidating entries, which certainly could not be accepted as the fact.

Thus it follows that everything which we have to guide us in the construction of the statute in question leads to the conclusion reached by the Circuit Court, unless it can be said that there is to be an exception in favor of the rule for avoiding great inconvenience, inequality, or injustice, referred to in Knowlton v. Moore, 172 U. S. 41, 77, 20 Sup. Ct. 747, 44 L. Ed. 969, ubi supra. As the conditions existed at the date of these invoices, a merchant importing skins or other merchandise from Italy, invoiced in lire, the equivalent of French francs, would, under our construction of the statute, have paid sixty per centum more duty than the merchant purchasing and invoicing exactly the same class of merchandise at Calcutta. Not only would this be an injustice, but, if it had a considerable place and became chronic, it might well be held to contravene the "favored nation" clauses found in so many of our treaties. Whether such conditions have ever existed has not been brought to our attention in such manner as to enable us to say positively that they could take on the features which we have suggested. Certain it is, however, that, as these contingencies could not have been anticipated by Congress in 1894, their possibility affords no substantial assistance in considering a statute passed at that date. If they now exist, or ever have existed, it has been at all times in the power of Congress, by enacting a very few words into a statute, to afford a remedy.

The United States raise a question of the jurisdiction of the board of general appraisers. On that point we need add but very little to what was said in the Circuit Court. The act of June 10, 1890, c. 407 (26 Stat. 131), is the law which established this tribunal. The United States rest on the words "decision of the collector," found in section 14, and they claim that in the case at bar the "decision" was

122 F.—49

not that of the collector of Boston, but of the Secretary of the Treasury. This is a narrow construction of the expression, because the ultimate tribunal which reliquidated was not the Secretary, but the collector, so that at common law mandamus would lie only against the latter, and not against the former. This position, moreover, begs the question, because, if the action of the Secretary was unlawful, as we hold it was, the collector could rest nothing done by him on that action, and whatever he did was his own.

The United States rely on United States v. Klingenberg, 153 U. S. 93, 14 Sup. Ct. 790, 38 L. Ed. 647. The opinion in that case is a very elaborate one, growing out of lack of compliance with the statutes on the part of the importer at the very origin of the transaction; that is, when he took his invoice. Several things said in it may be regarded as dicta; but, however that may be, United States v. Passavant, 169 U. S. 16, 18 Sup. Ct. 219, 42 L. Ed. 644, must be held to broaden the view of the jurisdiction of the board of general appraisers when there is involved a mere question of law, such as arises at bar on the letter of instructions from the secretary to the collector.

A useful discussion of the general power of the courts to revise questions of law arising on the face of proceedings by executive departments will be found in American School of Magnetic Healing v. McAnnulty, 187 U. S. 94, 23 Sup. Ct. 33, 47 L. Ed. ——. We also refer to Hyatt v. Corkran, 188 U. S. 691, 23 Sup. Ct. 456, 47 L. Ed. ——.

We are of the opinion that the conclusion of the Circuit Court was correct. The judgment of the Circuit Court is affirmed.