## CRAMER *v.* ARTHUR.

1. The valuation of foreign standard coins, which the act of March 3, 1873, c. 268 (17 Stat. 602; Rev. Stat., sect. 3564), requires the director of the mint to estimate annually, and the Secretary of the Treasury to proclaim on the first day of January, is as binding on collectors of customs and importers, as if declared by statute; and evidence is not receivable to show that it is inaccurate. *The Collector* v. *Richards* (23 Wall. 246) cited and reaffirmed.

2. Pursuant to sect. 2903 of the Revised Statutes, providing for the case of invoices made out in a depreciated currency issued and circulated under authority of any foreign government, regulations were established declaring that where the standard value of a foreign currency has been proclaimed by the Secretary of the Treasury, in the manner provided by law, such value shall control in estimating customs duties, unless collectors have been otherwise instructed, or unless a depreciation of the value of that currency, "expressed in an invoice from the standard of that currency, shall be shown by consular certificate thereto attached." *Held,* that the proclamation and certificate are conclusive.

ERROR to the Circuit Court of the United States for the Southern District of New York.

The facts are stated in the opinion of the court.

*Mr. Lewis Sanders* for the plaintiff in error.

*Mr. Assistant Attorney-General Smith, contra.*

MR. JUSTICE BRADLEY delivered the opinion of the court.

This is a suit against the collector of customs for the port of New York to recover back duties alleged to have been overcharged. In August and September, 1874, the plaintiff imported goods from Vienna, in Austria, chargeable with an *ad valorem* duty. The invoices upon which they were entered at the custom-house were made out in Austrian paper florins, in which currency they were purchased, and amounted to the sum of $10,163\frac{71}{100}$ florins. This was assessed and liquidated by the collector at the sum of $4,818, gold coin of the United States, by converting the same into Austrian silver florins at $45\frac{77}{100}$ cents for each paper florin, and $47\frac{6}{10}$ cents, gold coin of the United States, for each Austrian silver florin, making the duty equal to $1,930.67. The plaintiff paid the duty under a written protest, addressed to the collector, in which he assigned the following ground of objection, namely: "In computing the amount in United States money of foreign dutiable value of the merchandise covered by the said entries, you have estimated the value of the paper florin, being the currency in which invoices, upon which entries were made, were made out, to be greater than 40 cents. I claim that under existing laws and upon the fact that in computations at the custom-house the value of the paper florin therein specified should be estimated as of the value of 40 cents, and shall hold you responsible for the excess of duty thus illegally claimed and exacted." The plaintiff having appealed to the Secretary of the Treasury, without effect, brought the present action to recover the alleged excess of duty exacted.

On the trial, the foregoing facts being proved, the plaintiff took the stand, and testified that he was in Vienna in 1873 and part of 1874, and that in those years, and for some time prior thereto, the silver florin was not in circulation in Austria, having ceased to be a standard or measure of value early in 1873, owing to the fact that silver had been demonetized by the German Empire; where it had previously been current; its place, as a standard, being taken by the 8-florin Austria-Hungarian gold piece; that by the official paper or gazette of the stock exchange of Vienna the silver florin was worth $45\frac{46}{100}$ cents in American gold coin in September, 1874, and the paper

florin, $43\frac{71}{100}$ cents; that the actual value of the invoice in question was $4,442.56; that the amount of duty should have been assessed at $1,780.67; and that the excess paid and claimed is $150.

.The plaintiff further exhibited in evidence a letter of the Secretary of the Treasury to the collector of customs at New York, dated Oct. 23, 1874 (a few weeks after the importation of the goods in question), in which he stated, amongst other things, that the department had authentic information that the silver florin had generally been thrown out of use, both as a standard and as currency, its place as a standard being taken by the 8-florin gold piece, which had its exact equivalent in the 20-franc gold piece of France; that under these circumstances it became necessary to review the former action of the department in determining the value of the florin of Austria for assessment of duty on imports, and to apply to the 8-florin gold piece and the paper florin the rules applied to all currencies the values of which are not declared in terms by some specific statute: the collector was, therefore, directed to accept the certificate of a consul of the United States at any point in Austria-Hungary as to the value of the paper florin relatively to the 8-florin gold piece and its equivalent in American gold dollars, as the true value for duty of any invoice of merchandise properly expressed in that currency.

The defendant gave in evidence the consular certificate of the United States consul at Vienna, attached to the invoice, in which it was stated that the true value of the currency of the Austria-Hungarian monarchy, in which the invoice was made out, was $45\frac{77}{100}$ cents estimated in United States gold, silver florin being $47\frac{60}{100}$ cents. He also gave in evidence an extract from the proclamation of the Secretary of the Treasury, made on the 1st of January, 1874, announcing the determinations of the value of foreign moneys made by the director of the mint under the act of March 3, 1873 (17 Stat. 602), which extract was as follows, to wit:—

"The following list of standard values of foreign currencies in the money of account of the United States shall be used in the computation of customs duties, until otherwise provided by law or regulation:—

"Foreign moneys of account and their values in United States money of account. Austria, monetary unit, florin ; standard, silver; value in U. S. money of account, 47.60 [cents]."

Upon this evidence the court directed a verdict for the defendant, and the plaintiff excepted.

Since the transactions above mentioned took place, we have decided the case of *The Collector* v. *Richards* (23 Wall. 246), which arose about the same time, and in which some of the questions involved in the present case were determined. We there held that the act of March 3, 1873, which declared that the value of foreign coin, as expressed in the money of account of the United States, should be that of the pure metal of such coin of standard value ; and that the values of the standard coins in circulation, of the various nations of the world, should be estimated annually by the director of the mint, and be proclaimed on the first day of January by the Secretary of the Treasury, superseded previous acts passed for fixing the value of foreign money, both in estimating the invoices of goods imported from foreign countries, and for other purposes. Prior to 1873, various acts had been passed fixing the value of foreign money in invoices, commencing with the collection act of 1789, by the eighteenth section of which the rates for estimating certain foreign coins and currencies were prescribed. 1 Stat. 41. By this act, amongst other things, the pound sterling was valued at $4.44. Various changes and additions were made in subsequent laws. Id. 167, 673 ; 2 id. 121 ; 5 id. 496, 625 ; 9 id. 14 ; 12 id. 207. In 1842, the value of the pound sterling, in computations for payments to the treasury and in appraising merchandise, was fixed at $4.84. The last general law relating to the values of other foreign moneys was that of May 22, 1846. 9 id. 14. By this act, amongst other things, the value of the florin of the southern States of Germany was fixed at 40 cents ; the florin of the Austrian Empire and of the city of Augsburg, at 48½ cents ; and the franc of France, Belgium, &c., at 18 cents 6 mills. This was apparently the act upon which the plaintiff in his protest based his claim that the florin in his invoice should be estimated at 40 cents. It was this act under which the importer in *The Collector* v. *Richards* claimed that the franc should be

estimated at 18 cents 6 mills. In that case we held that the act of 1846 was repealed by the act of 1873 (which expressly repealed all acts and parts of acts inconsistent therewith); and that, instead of a fixed and permanent valuation of foreign coins (which must often involve a departure from the true values), Congress had adopted the juster plan of having them subjected to annual revision by the director of the mint, and announced to the public by proclamation of the Secretary of the Treasury. And as the franc had been thus proclaimed to be worth 19 cents and 3 mills, we decided that the collector rightly adopted that valuation.

In the present case, the act of 1846, if it were in force, would not help the plaintiff, inasmuch as it fixes the value of the Austrian florin at $48\frac{1}{2}$ cents, which is a higher rate than that announced in the Secretary's proclamation of 1874. He seems, however, to have based his claim on the valuation, in the law of 1846, of the florin of the southern States of Germany, which was at 40 cents. But, since we have decided that that act was repealed by the act of 1873, it is unnecessary to examine it further.

That the florin is the standard money of account of Austria is as evident as that the pound sterling is the standard money of account of Great Britain. The plaintiff's own invoice is a proof of this. Whether represented by a corresponding coin of equal amount is of no consequence. It was only since the beginning of the present century that the pound sterling was thus represented; and yet its value was as fixed and certain before the sovereign was coined as since. Coin is the basis of the currency of both countries. The plaintiff concedes that the eight-florin gold piece is a standard coin of Austria; and he does not pretend that, according to this standard, the florin would be less than it was valued at in the proclamation of the Secretary of the Treasury. The silver florin was also formerly a standard coin in Austria, and the florin as a money of account originally derived its value therefrom. It was from this coin that the valuation of the florin was made by the director of the mint, as set forth in the proclamation of the Secretary. That valuation, so long as it remained unchanged, was binding on the collector and on importers, — just as bind-

ing as if it had been in a permanent statute, like the statute of 1846, for example. Parties cannot be permitted to go behind the proclamation, any more than they would have been permitted to go behind the statute, for the purpose of proving by parol, or by financial quotations in gazettes, that its valuations are inaccurate. The government gets at the truth, as near as it can, and proclaims it. Importers and collectors must abide by the rule as proclaimed. It would be a constant source of confusion and uncertainty if every importer could, on every invoice, raise the question of the value of foreign moneys and coins.

But whilst the annual proclamation of the determinations made by the director of the mint has taken the place of a permanent statutory valuation of foreign coins, it has no greater force than a statute would have. The question still remains, whether the fact that the invoice was made out in a depreciated currency entitled the plaintiff to a reduction, and, if it did, whether such reduction was refused by the collector.

The laws have always made provision for the case of invoices made out in depreciated currencies. In the collection act of 1799, the sixty-first section, which fixed the values of different foreign moneys, concluded with the following proviso : " *Provided*, that it shall be lawful for the President of the United States to cause to be established fit and proper regulations for estimating the duties on goods, &c., imported into the United States, in respect to which the original cost shall be exhibited in a depreciated currency, issued and circulated under authority of any foreign government." This proviso has always continued in force, and now constitutes sect. 2903 of the Revised Statutes. Such a law is the more necessary, in view of another provision, enacted in 1801 (2 Stat. 121) and continued in sect. 2838 of the Revised Statutes, directing that "all merchandise subject to a duty *ad valorem* shall be made out in the currency of the place or country where the importation shall be made, and shall contain a true statement of the actual cost of such merchandise in such foreign currency or currencies, without any respect to the value of the coins of the United States, or of foreign coins by law made current within the United States

in such foreign place or country." It was the object of this law to compel the parties to show, in the invoices, the actual prices and cost of their goods, in the currency of the country where bought, and not leave it to them to make a pretended estimate of the cost in a coin valuation. It is true, the government is not bound by the invoice, but may have the value of the goods appraised. Rev. Stat., sects. 2904, 2907. Nevertheless, such invoices, exhibiting the actual transactions, and capable of being verified by oath, are essential instrumentalities in the prevention of fraud; and, in the absence of suspicious circumstances, usually furnish the basis for estimating the actual values of the goods. But since they are required to be expressed in the actual currency of the country of exportation, and since that currency may be depreciated, it is obvious that the authority given to the President by the act of 1799, to establish fit and proper regulations for estimating the duties when the goods are invoiced in such money, is very important. It was passed at a time when the nations of Europe were at war, and the United States was neutral. In England and France, and perhaps other countries, specie payments had been suspended, and currencies based on government credit had been adopted. The law seems to have had in view artificial money of this kind; a depreciated currency, not based on specie, but still "issued and circulated under authority of the government." But it has been liberally construed by the government; and the President, acting through the Secretary of the Treasury, has established regulations on the subject which are sufficiently broad to meet every proper case.

The regulation in force at the time of the importation in question was as follows, namely : —

" Where the standard value of a foreign currency has been proclaimed by the Secretary of the Treasury, in the manner provided by law, that value is to be taken in all cases in estimating customs duties, unless collectors have been otherwise instructed, or unless a depreciation of the value of the foreign currency, expressed in an invoice from the standard of that currency, shall be shown by consular certificate thereunto attached."

In the present case a consular certificate was, in fact, attached to the invoice in the following words, to wit : —

"I, P. S. Post, consul of the United States of America, do hereby certify that the true value of the currency of the Austria-Hungarian Monarchy, in which currency the annexed invoice of merchandise is made out, is $45\frac{77}{100}$ cents estimated in United States gold, silver florin being $47\frac{60}{100}$ cents.

(Signed)          "P. S. POST."     [SEAL.]

In this certificate the consul assumes the value of the silver florin to be as it was proclaimed to be at the beginning of the year by the Secretary of the Treasury, namely, $47\frac{60}{100}$ cents; and, on this basis, he certifies that the value of the florin in the currency in which the invoice was made out was $45\frac{77}{100}$ cents; and this, as we understand the statement of the case, is the valuation adopted by the collector in assessing the duties in question. The plaintiff seeks to go behind this valuation, and to show that, at the time of the purchase of the goods, the value of the silver florin in Vienna, as quoted in the papers, and as exhibited by the actual rate of exchange, was less than $47\frac{60}{100}$ cents, namely, $45\frac{46}{100}$ cents, and that the value of the paper florin was $43\frac{71}{100}$ cents.

This we think the plaintiff cannot be allowed to do. The proclamation of the Secretary and the certificate of the consul must be regarded as conclusive. In the estimation of the value of foreign moneys for the purpose of assessing duties, there must be an end to controversy somewhere. When Congress fixes the value by a general statute, parties must abide by that. When it fixes the value through the agency of official instrumentalities, devised for the purpose of making a nearer approximation to the actual state of things, they must abide by the values so ascertained. If the currency is a standard one, based on coin, the Secretary's proclamation fixes it; if it is a depreciated currency, the parties may have the benefit of a consular certificate. To go behind these and allow an examination by affidavits in every case would put the assessment of duties at sea. It would create utter confusion and uncertainty. If existing regulations are found to be insufficient, if they lead to inaccurate results, the only remedy is to apply to the President, through the Treasury Department, to change the regulations. From the letter of the Secretary exhibited in this case, we infer that this was afterwards done,

and that he made the desired change.  But this change in the regulations does not affect prior transactions which took place before they went into effect.  These transactions must be governed by the regulations in force at the time.  It is of the utmost consequence to the government, and it is, on the whole, most beneficial to importers, that the value of foreign moneys should be officially ascertained, and that they should be fixed by a uniform method or rule.

*Judgment affirmed.*