UNITED STATES v. AMÉRICAN EXPRESS CO. et al.

(Circuit Court, D. Massachusetts.  February 16, 1910.)

No. 464 (2,031).

1. CUSTOMS DUTIES (§ 34*)—TREASURY REGULATIONS—STANDARD SAMPLES OF WOOL.

The standard samples of wool prescribed by the Secretary of the Treasury on the authority of Tariff Act July 24, 1897, c. 11, § 1, Schedule K, par. 352, 30 Stat. 182 (U. S. Comp. St. 1901, p. 1664), are conclusive in respect to classification and quality, except, perhaps, where the issue is one of fraud or mistake, and regulations in respect to such samples are not subject to review by the courts or the Board of General Appraisers; and where imported wools answer the quality of the standard samples, they should be classified accordingly, regardless of whether such standards operate unjustly, oppressively, or disproportionately to other classifications and values.

[Ed. Note.—For other cases, see Customs Duties, Dec. Dig. § 34.*]

2. CUSTOMS DUTIES (§ 34*)—MERINO WOOL—"MERINO BLOOD, IMMEDIATE OR REMOTE."

In Tariff Act July 24, 1897, c. 11, § 1, Schedule K, par. 349, 30 Stat. 182 (U. S. Comp. St. 1901, p. 1664), relating to wools, the words "merino blood, immediate or remote," convey an unmistakable meaning, and include wool in which the presence of merino blood is marked, though of inferior quality.

[Ed. Note.—For other cases. see Customs Duties, Dec. Dig. § 34.*]

3. CONSTITUTIONAL LAW (§ 73*)—RELIEF FROM HARDSHIP OF TREASURY REGULATIONS—FUNCTION OF COURTS.

Relief from hardships of authorized government regulations should be sought from the executive department, which, under expressly delegated authority, established such regulations, rather than from the courts.

[Ed. Note.—For other cases, see Constitutional Law, Dec. Dig. § 73.*]

4. CUSTOMS DUTIES (§ 1*) — TARIFF TAXATION — REVIEW — CONSTITUTIONAL POWER.

There is no vested right to import superior to the power of Congress to say upon what terms it shall be done, and it is quite within the constitutional discretion of Congress to say upon what terms foreign trade may be had, and to determine how the justice of the claims for alleged excessive tariff taxation shall be ascertained and disposed of. Such claims may in the discretion of Congress be left altogether to an executive department, or in suits against the collectors of customs, or to the determination of a Board of General Appraisers, subject to review by the courts upon such particulars only as the law may prescribe.

[Ed. Note.—For other cases, see Customs Duties, Cent. Dig. § 1; Dec. Dig. § 1.*]

On Application for Review of a Decision by the Board of United States General Appraisers.

The Board of General Appraisers sustained the importers' protest against the assessment of duty by the collector of customs at the port of Boston.  The Board's opinion reads as follows:

McCLELLAND, General Appraiser.  These protests are against the assessment of duty at the rate of 10 cents a pound on the estimated weight of wool on Cape sheepskins, as class 1 wool.  The returned weight of the wool is not disputed, but it is claimed that the wool so returned is of class 3, and dutiable at the rate of 3 cents per pound, under the provisions of paragraphs 358 and

360, tariff act of 1897 (Act July 24, 1897, c. 11, § 1, Schedule K, 30 Stat. 183 [U. S. Comp. St. 1901, p. 1665]).

It is contended with almost stubborn insistence on the part of the government, as shown by the testimony and an elaborate brief, that the classification of the said wool was correctly made by the collector, for the sole reason, as alleged, that it conforms to standard sample 137 deposited in the principal custom houses in the United States under authority of the Secretary of the Treasury, pursuant to the provisions of paragraph 352 of said act.

In G. A. 6,695 (T. D. 28,632) we considered and determined adversely to the government an issue in all respects comparable with that here involved, and we do not consider that anything, either by way of evidence or argument, has been presented by the government to lead us to depart from the conclusion therein reached.

It would seem as though the government's side of the issue has been presented upon an entirely erroneous theory, to wit: That since the government examiner was satisfied that certain of the wool found on these skins was comparable with standard sample 137, it must therefore be returned and classified as of the first class, and that there remains no power, either in the Board of General Appraisers or the courts, to change that classification, which is, in effect, contending that the persons chosen by the Secretary of the Treasury to select the standard samples contemplated by paragraph 352, and the official examiners passing the wool, were to be the sole arbitrators during the life of the tariff act under which such standard samples were chosen as to what wools should be included within the classes specified in the act.

Counsel for the government seems to lay much stress upon the words in paragraph 349, "or other wools of merino blood, immediate or remote"; but we think, when it is considered that the growth on the skins of these so-called Cape sheep is a mixture of wool, hair, and kemp, with the two latter largely predominating, and that such sheep are a degenerate species, with only a trace of the merino blood left in some of them, and that the value of the so-called wool, after being pulled from the pelt and washed, ranges from 3 to 10 cents a pound, it is not difficult to conclude that such a mixture was never intended by Congress to be classified as wool of the first class, subject to a rate of duty almost, if not altogether, twice greater than the average price per pound for which it will sell in the market, without considering the cost of labor and the cost of washing.

It is not to be overlooked that the wool which is taken from these skins, considering the great aggregate of skins imported, is of infinitesimal value. The skins are primarily imported to be made into leather, and it is only in the necessary course of the preparation of such skins for tanning that this so-called wool must be removed from the pelts.

It is clearly our view that when Congress arranged the wool schedule of the tariff, dividing wools into classes, and vesting in the Secretary of the Treasury authority to deposit in the principal custom houses of the United States standard samples as guides for the classification thereof by collectors of customs, Congress contemplated only straight wools, and not such a combination of wool, hair, and kemp as is involved in these protests.

We see no reason to depart either from the reasoning expressed or the conclusion reached in G. A. 6,695, supra, and we therefore sustain the protests and reverse the decisions of the collector.

D. Frank Lloyd, Deputy Asst. Atty. Gen. (Charles D. Lawrence, Asst. Counsel, of counsel), for the United States.

Albert S. Hutchinson (Putnam B. Smith, of counsel), for the importers.

ALDRICH, District Judge. In this case the collector of customs at Boston assessed duty upon an importation of wool as in class 1 in accordance with sample No. 137, which was on file in the custom house in Boston as a standard for the classification of Cape of Good Hope native skin wool. These standard samples were officially ar-

ranged and established under the direction of the Secretary of the Treasury as authorized by and in pursuance of paragraph 352 of the tariff act of 1897, and the duty imposed was that required upon the first class of wools and hair provided by paragraph 357, reduced under paragraph 360 one cent per pound because the wools were on the skin at the time of the importation. The action of the collector of customs was reversed by the Board of General Appraisers, and the case comes here on appeal from that tribunal.

Contrary to the view held by the Board of General Appraisers, I am inclined to view the authorized treasury regulation in respect to samples of wool in the Boston port as a government or department regulation, promulgated under power conferred by Congress upon the executive branch of the government, and as conclusive in respect to classification and quality, except in cases, perhaps, where the issue is one of fraud or mistake; and whether relief upon that ground would be afforded by the courts rather than by the executive branch of the government need not be considered here, because the claim in this case is not fraud or mistake, but one based upon the idea of an unsound interpretation of the act of Congress authorizing the regulation. In other words, the claim is that Congress intended to authorize a classification and regulation in respect to samples of straight wool only, while the regulation in question, it is claimed, covers the wool of the degenerate merino, or the wool of sheep so remote in blood as to have only a trace of the merino.

It is quite unnecessary to give attention to the object of legislation of this kind, except to say that the growth of business in this department, as in many others, has required that Congress should authorize classifications, commissions, and other instrumentalities for simplification in the field of government transactions. If such a defense as the one made here is admissible under the usual protest, where would the line be drawn? If it holds good in one case upon the ground that the standard sample is from sheep too remote in blood and race, why is not the efficacy of the regulation altogether lost, and for the reason that if the issue of fact can be raised in one case, it can in all, and the question as to quality and classification would therefore at once be at large again.

Paragraph 349 of the act of Congress in question includes in class 1 merino, mestiza, metz, or other wools of merino blood, immediate or remote, imported into the United States from Cape of Good Hope and other countries. The evidence is very strong that the importation answered the quality of the sample, and, indeed, it is not contended otherwise; the contention of the importer being that the sample in question is inferior to samples in classes 2 and 3. The case of the importer upon this ground is very strong, and if the question of the quality, value, and proper classification were an open one here, it might not be difficult to find that the classification and duty based upon the samples operated with inequality in respect to value. But it would seem, as already said, as the issue was not one of fraud or mistake, that relief from the hardships of the authorized government regulation should be sought from the executive department, which under

177 F.—47

expressly delegated authority established the samples and prescribed the lines upon which the classifications should be made.

Cramer v. Arthur, 102 U. S. 612, 26 L. Ed. 259, would seem to indicate that, when Congress regulates things to be done through the agency of the official instrumentalities of the Treasury Department, devised for the purpose of nearer approximation to the actual state of things, which in practice operate with inequality, the one remedy for inaccuracies is to apply to the President through the Treasury Department to change the regulation. The doctrine of this case was recognized in United States v. Klingenberg, 153 U. S. 93, 14 Sup. Ct. 790, 38 L. Ed. 647.

Aside from the view that the Chinese exclusion cases, like Fong Yue Ting v. United States, 149 U. S. 698, 13 Sup. Ct. 1016, 37 L. Ed. 905, and United States v. Ju Toy, 198 U. S. 253, 25 Sup. Ct. 644, 49 L. Ed. 1040, and others, have a strong analogous bearing upon the question of the conclusiveness of an authorized executive regulation of the kind in question, is the very pertinent illustration of Mr. Justice Gray in the Fong Yue Ting Case, 149 U. S. 714, 715, 13 Sup. Ct. 1022, 37 L. Ed. 905, based upon the authorities which he cites, that:

"Claims to recover back duties illegally exacted on imports may, if Congress so provides, be finally determined by the Secretary of the Treasury. Cary v. Curtis, 3 How. 236 [11 L. Ed. 576]; Curtis v. Fiedler, 2 Black, 461, 478, 479 [17 L. Ed. 273]; Arnson v. Murphy, 109 U. S. 238, 240 [3 Sup. Ct. 184, 27 L. Ed. 920]. But Congress may, as it did for long periods, permit them to be tried by suit against the collector of customs. Or it may, as by the existing statutes, provide for their determination by a board of general appraisers, and allow the decisions of that board to be reviewed by the courts in such particulars only as may be prescribed by law. Act June 10, 1890, c. 407, §§ 14, 15, 25, 26 Stat. 137, 138, 141 [U. S. Comp. St. Supp. 1909, p. 818]; In re Fasset, 142 U. S. 479, 486, 487 [12 Sup. Ct. 295, 35 L. Ed. 1087]; Passavant v. United States, 148 U. S. 214 [13 Sup. Ct. 572, 37 L. Ed. 426]."

See, also, Buttfield v. Stranahan, 192 U. S. 470, 496, 497, 24 Sup. Ct. 349, 48 L. Ed. 525, which would seem to be strikingly in point as covering the question here.

Thus, as there is no vested right to import superior to the power of Congress to say upon what terms it shall be done, it is quite within the constitutional discretion of Congress to declare upon what terms foreign trade may be had and to determine how the justice of claims for alleged excessive tariff taxation shall be ascertained and disposed of. Such claims may be left altogether to the executive department, or in suits against the collector, or to the determination of a Board of Appraisers, subject to review by the courts, or subject to review by the court upon such particulars only as the law may prescribe; and it would seem clear that Congress did not intend to have the regulation in question in respect to standard wool samples subject to review by the courts or by the Board of Appraisers, because paragraph 352 imperatively declares that the standard samples of all wools which are now or may be hereafter deposited in the principal custom houses of the United States under the authority of the Secretary of the Treasury shall be the standards for classification.

Congress having delegated to the executive department of the government full authority to establish standards under the broad terms

of the statute expressive of merino wool, immediate or remote, coupled with an express statutory declaration that such standards shall be the standards for classification, the question whether a regulation standard operates unjustly, oppressively, or disproportionately with reference to other classifications and values, and whether relief should be granted, are questions addressing themselves to that branch of the government to which the authority was fully delegated, rather than to the courts.

The decision of the Board of Appraisers was that Congress, investing authority in the Secretary of the Treasury in respect to standards, contemplated only straight wools; but, if the regulations and acts of the executive department under this statute are subject to review by the courts, it will be seen that in this case the evidence is very strong that the wool, although of an inferior quality, was merino wool, and it is beyond question, and not disputed, that the wool was from sheep of merino blood, immediately or remote, and therefore the importation would seem to be within the express terms of paragraph 349 in respect to class 1. The words "merino blood, immediate or remote," convey an unmistakable meaning, and would seem, whether justly or unjustly, to clearly indicate this importation. The sample and importation answered the descriptive words of the statute with respect to merino wool. The evidence is strong as to the marked presence of merino blood, and the inferior quality of the wool was variously accounted for as resulting from the introduction of merino blood, or from the introduction of other blood into the merino, or through the merino blood pure and simple going back on itself under climatic, feed, and other influences.

The decision of the Board of General Appraisers is reversed.