## AMALGAMATED TEXTILES, Limited, v. UNITED STATES.

### Customs Appeal No. 3956.

Court of Customs and Patent Appeals.

June 1, 1936.

Brooks & Brooks, of New York City (Ernest F. A. Place, of New York City, of counsel), for appellant.

Joseph R. Jackson, Asst. Atty. Gen. (Charles D. Lawrence, Sp. Asst. to Atty. Gen., and Richard E. FitzGibbon, Sp. Atty., of Yonkers, of counsel), for the United States.

Before GRAHAM, Presiding Judge, and BLAND, HATFIELD, GARRETT, and LENROOT, Associate Judges.

LENROOT, Associate Judge.

This is an appeal from a judgment of the United States Customs Court (Third Division) which overruled a protest of appellant against the assessment of duty by the collector upon certain woolen cloth, imported at the port of New York from Great Britain on July 25, 1933.

The merchandise was invoiced in pounds sterling, and the protest claimed that the collector failed to convert the currency of the invoice into money of account of the United States in the manner required by section 522 of the Tariff Act of 1930, 46 Stat. 739, 31 U.S.C.A. § 372, which section reads as follows:

"Sec. 522. Conversion of Currency.

"(a) Value of Foreign Coin Proclaimed by Secretary of Treasury.—Section 25 of the Act of August 27, 1894, entitled 'An Act to reduce taxation, to provide revenue for the Government, and for other purposes,' as amended, is reenacted without change as follows:

" 'Sec. 25. That the value of foreign coin as expressed in the money of account of the United States shall be that of the pure metal of such coin of standard value; and the values of the standard coins in circulation of the various nations of the world shall be estimated quarterly by the Director of the Mint and be proclaimed by

the Secretary of the Treasury quarterly on the 1st day of January, April, July, and October in each year.'

"(b) Proclaimed Value Basis of Conversion.—For the purpose of the assessment and collection of duties upon merchandise imported into the United States on or after the day of the enactment of this Act, wherever it is necessary to convert foreign currency into currency of the United States, such conversion, except as provided in subdivision (c), shall be made at the values proclaimed by the Secretary of the Treasury under the provisions of section 25 of such Act of August 27, 1894, as amended, for the quarter in which the merchandise was exported.

"(c) Market Rate When No Proclamation.—If no such value has been proclaimed, or if the value so proclaimed varies by 5 per centum or more from a value measured by the buying rate in the New York market at noon on the day of exportation, conversion shall be made at a value measured by such buying rate. If the date of exportation falls upon a Sunday or holiday, then the buying rate at noon on the last preceding business day shall be used. For the purposes of this subdivision such buying rate shall be the buying rate for cable transfers payable in the foreign currency so to be converted; and shall be determined by the Federal Reserve Bank of New York and certified daily to the Secretary of the Treasury, who shall make it public at such times and to such extent as he deems necessary. In ascertaining such buying rate such Federal reserve bank may in its discretion (1) take into consideration the last ascertainable transactions and quotations, whether direct or through exchange of other currencies, and (2) if there is no market buying rate for such cable transfers, calculate such rate from actual transactions and quotations in demand or time bills of exchange." ·

The involved merchandise was exported from Great Britain on July 15, 1933. On July 1, 1933, the Secretary of the Treasury issued a proclamation (T.D. 46497) which, in so far as is here pertinent, reads as follows:

"Values of foreign moneys
"[Circular No. 1, Director of the Mint]
"Treasury Department, July 1, 1933.

"Pursuant to section 522, title IV, of the Tariff Act of 1930, reenacting section 25 of the act of August 27, 1894, as amended, the following estimates by the Director of the Mint of the values of foreign monetary units are hereby proclaimed to be the values of such units in terms of the money of account of the United States that are to be followed in estimating the value of all foreign merchandise exported to the United States during the quarter beginning July 1, 1933, expressed in any such foreign monetary units: Provided, however, That if no such value has been proclaimed, or if the value so proclaimed varies by 5 percent or more from a value measured by the buying rate in the New York market at noon on the day of exportation, conversion shall be made at a value measured by such buying rate, as determined and certified by the Federal Reserve Bank of New York and published by the Secretary of the Treasury pursuant to the provisions of section 522, title IV, of the Tariff Act of 1930.

"Dean Acheson,
"Acting Secretary of the Treasury.

"Values of foreign monetary units
"[At par as regards gold units; nongold units have no fixed par with gold]

| Country | Legal Standard | Monetary Unit | Value in terms of U. S. Money | Remarks |
|---|---|---|---|---|
| * * * | * * * | * * * | * * * | * * * |
| * * * | Gold | * * * | * * * | * * * |
| * * * | * * * | * * * | * * * | * * * |
| Great Britain | do. | Pound Sterling | 4.8665 | Obligation to sell gold at legal monetary par suspended, effective Sept. 21, 1931. |
| * * * | * * * | * * * | * * * | * * *" |

On July 22, 1933, the Acting Commissioner of Customs issued T.D. 46536, addressed to "Collectors of Customs and Others Concerned." The heading of said T. D. reads as follows:

"Foreign currencies—Rates of exchange
"Rates of exchange certified to the Secretary of the Treasury by the Federal Reserve Bank of New York under the provisions of section 522 (c), Tariff Act of 1930."

It appears from this treasury decision that on July 15, 1933, the value of the

British pound sterling was, in United States money, $4.77875.

The collector liquidated the entry upon the basis of the value of the pound sterling at $4.8665, as stated in said proclamation of the Secretary of the Treasury, whereas the claim of appellant is that the entry should have been liquidated upon the exchange rate given, viz., $4.77875. This was the only issue before the trial court, and is the only issue before us. It will be noted that the rate proclaimed by the Secretary of the Treasury did not vary 5 per centum from the exchange rate as given in said T.D. 46536.

Upon the trial there were stipulated in evidence two acts of the Parliament of Great Britain, the pertinent portions of the first of which read as follows:

"An Act to facilitate the return to a gold standard and for purposes connected therewith.

"[13th May 1925]

\*    \*    \*    \*    \*    \*    \*

"1.  (1) Unless and until His Majesty by Proclamation otherwise directs—

"(a) The Bank of England, notwithstanding anything in any Act, shall not be bound to pay any note of the Bank (in this Act referred to as "a bank note") in legal coin within the meaning of section six of the Bank of England Act, 1833, and bank notes shall not cease to be legal tender by reason that the Bank do not continue to pay bank notes in such legal coin:

· "(b) .Subsection (3) of section one of the Currency and Bank Notes Act, 1914 (which provides that the holder of a currency note shall be entitled to obtain payment for the note at its face value in gold coin) shall cease to. have effect:

"(c) Section eight of the Coinage Act, 1870 (which entitles any person bringing gold bullion to the Mint to have it assayed, coined and delivered to him) shall, except as respects gold bullion brought to the Mint by the Bank of England, cease to have effect.

"(2) So long as the preceding subsection remains in force, the Bank of England shall be bound to sell to any person who makes a demand in that behalf at the head office of the Bank during the office hours of the Bank, and pays the purchase price in any legal tender, gold bullion at the price of three pounds, seventeen shillings and tenpence halfpenny per ounce troy of gold of the standard of fineness prescribed for gold coin by the Coinage Act, 1870, but only in the form of bars containing approximately four hundred ounces troy of fine gold."

So much of said second act of Parliament as is here pertinent reads as follows:

"An Act to suspend the operation of subsection (2) of section one of the Gold Standard Act, 1925, and for purposes connected therewith.

"[21st September 1931].

\*    \*    \*    \*    \*    \*    \*

"1.  (1) Unless and until his Majesty by Proclamation otherwise directs, subsection (2) of section one of the Gold Standard Act, 1925, shall cease to have effect, notwithstanding that subsection (1) of the said section remains in force."

Appellant introduced certain testimony tending to show that the gold sovereign, which it is admitted is the equivalent of the pound sterling, was not in circulation in England in 1934.

The Customs Court held that the value of the pound sterling, as stated in said proclamation of the Secretary of the Treasury, was conclusive and binding upon the collector, inasmuch as such value did not vary 5 per centum from its exchange value, and that its accuracy could not be inquired into by the courts. In support of this position the court cited certain decisions of the Supreme Court of the United States, which will hereinafter be discussed.

As hereinbefore stated, judgment was entered by the trial court overruling appellant's protest, and from such judgment this appeal was taken. It is appellant's contention that, by reason of the acts of Parliament of Great Britain introduced in evidence, gold coins were not, at the time of the exportation of the involved merchandise, standard coins in circulation in Great Britain, and that such fact is recognized by the Secretary of the Treasury by the notation opposite the value given for the pound sterling, reading as follows: "Obligation to sell gold at legal monetary par suspended, effective Sept. 21, 1931."

While appellant assigns error of the Customs Court in not finding and holding that said proclamation of the Secretary of the Treasury, which purported to give a value of the pound sterling as estimated by the Director of the Mint, was null and

void pro tanto, this assignment seems to have been abandoned upon this appeal, for in appellant's brief we find the following:

"The present case does not challenge the correctness, in the sense of relative accuracy, of the Secretary's proclamation, nor that of the finding by the Director of the Mint, nor that of the certification by the Federal Reserve Bank. It is not claimed that any of those agencies erred, nor that the published determinations of any of them are erroneous; it is claimed that the *collector* erred in making the conversion which he did in liquidation.

"It is conceded that the relative value of the amount of pure gold, in the British coin known as a sovereign; *formerly* in circulation both as currency and as a standard, as compared with the value of the amount of pure metal in a gold dollar of the United States, was as 4.8665 is to one. Also it is conceded that the buying rate in the New York market at noon on the day of exportation was correctly stated in T.D. 46536.

"The appellant contends that the collector of customs, given two means of determining the dutiable value of the goods, both of which means had been furnished by officials in the executive branch of the Government and by quasi-public officials, and furnished in compliance with legislative mandate, adopted the wrong alternative. The appellant is not trying to set up, nor is it urging the correctness of a value for the currency of the invoice which is different from any furnished by Government agencies in accordance with statutory directions."

Inasmuch as it appears from the foregoing quotation that it is not claimed that the Secretary of the Treasury erred, or that his published determination is erroneous, it would appear that the collector lacked authority, under the specific terms of said section 522 of the Tariff Act of 1930, to convert the pound sterling named in the invoice into United States money at the exchange value rather than the proclaimed value, for under that section such exchange value may be resorted to only if no value has been proclaimed by the Secretary of the Treasury, or if the rate proclaimed varies by 5 per centum or more from the exchange rate.

However, we prefer to consider the case on the merits regardless of this admission in appellant's brief.

■ It is our opinion that our decision herein is controlled by the decisions of the Supreme Court hereinafter discussed, most of which are cited in the decision of the Customs Court in the case at bar.

The case of Cramer v. Arthur, 102 U.S. 612, 618, 26 L.Ed. 259, involved duties payable upon the importation of certain merchandise imported from Austria in 1874. At that time there was in effect an act of Congress, approved March 3, 1873 (17 Stat. 602), entitled "An Act to establish the Custom-house Value of the Sovereign or Pound sterling of Great Britain, and to fix the Par of Exchange." The first section of that act read as follows: "Section 1. That the value of foreign coin as expressed in the money of account of the United States shall be that of the pure metal of such coin of standard value; and the values of the standard coins in circulation of the various nations of the world shall be estimated annually by the director of the mint, and be proclaimed on the first day of January by the Secretary of the Treasury."

There was also in effect, at the time of the importation involved in the case last cited, section 2903 of the Revised Statutes, which authorized the President of the United States to establish regulations for estimating the duties on imported merchandise invoiced in a depreciated currency issued and circulated under authority of any foreign government. Pursuant to such authority the following regulation was in force, as quoted in the opinion in said case of Cramer v. Arthur, supra: "Where the standard value of a foreign currency has been proclaimed by the Secretary of the Treasury, in the manner provided by law, that value is to be taken in all cases in estimating customs duties, unless collectors have been otherwise instructed, or unless a depreciation of the value of the foreign currency, expressed in an invoice from the standard of that currency, shall be shown by consular certificate thereunto attached."

It appears from the opinion in that case that on March 3, 1873, the Secretary of the Treasury issued a proclamation, the pertinent portion of which is quoted in said opinion as follows:

"The following list of standard values of foreign currencies in the money of account of the United States shall be used

in the computation of customs duties, until otherwise provided by law or regulation:—

"Foreign moneys of account and their values in United States money of account. Austria, monetary unit, florin; standard, silver; value in U. S. money of account, 47.60. (cents)."

It also appears from said opinion that, attached to the invoice was a consular certificate stating that the true value of the Austrian currency in which the invoice was made out was 45⁷⁷/₁₀₀ cents estimated in United States gold, the silver florin being 47⁶⁰/₁₀₀ cents; that the collector converted the paper florins into silver florins at the rate named in said consular certificate, and the silver florins into gold coin of the United States at the rate named in said proclamation of the Secretary of the Treasury; and that the importer claimed that the value of the paper florin should have been computed at a less rate than that applied by the collector. It further appears from said opinion that, upon the trial of the cause in the court below, the importer introduced evidence showing that, at the time of the importation of the merchandise, the silver florin was not in circulation in Austria, and had ceased to be a standard or measure of value early in 1673, and that its place had been taken by the eight-florin Austria-Hungary gold piece.

The Supreme Court in its opinion stated: "That the florin is the standard money of account of Austria is as evident as that the pound sterling is the standard money of account of Great Britain. The plaintiff's own invoice is a proof of this. Whether represented by a corresponding coin of equal amount is of no consequence. It was only since the beginning of the present century that the pound sterling was thus represented; and yet its value was as fixed and certain before the sovereign was coined as since. Coin is the basis of the currency of both countries. The plaintiff concedes that the eight-florin gold piece is a standard coin of Austria; and he does not pretend that, according to this standard, the florin would be less than it was valued at in the proclamation of the Secretary of the Treasury. The silver florin was also formerly a standard coin in Austria, and the florin as a money of account originally derived its value therefrom. It was from this coin that the valuation of the florin was made by the

director of the mint, as set forth in the proclamation of the Secretary. That valuation, so long as it remained unchanged, was binding on the collector and on importers,—just as binding as if it had been in a permanent statute, like the statute of 1846, for example. Parties cannot be permitted to go behind the proclamation, any more than they would have been permitted to go behind the statute, for the purpose of proving by parol, or by financial quotations in gazettes, that its valuations are inaccurate. The government gets at the truth, as near as it can, and proclaims it. Importers and collectors must abide by the rule as proclaimed. It would be a constant source of confusion and uncertainty if every importer could, on every invoice, raise the question of the value of foreign moneys and coins."

The parallel between the above-cited case and the case at bar is evident. There it was established as a fact that the silver florin, named in the proclamation of the Secretary of the Treasury as the standard in Austria, was not in circulation at the time of the importation of the merchandise there involved. A like claim is here made, that the equivalent of the pound sterling in gold was not in circulation in Great Britain at the time of the importation of the merchandise here involved. The Supreme Court in the Cramer Case declined to go behind the proclamation of the Secretary of the Treasury and inquire into the facts upon which his proclamation was based, and for the same reasons as given by the Supreme Court for so declining, we must decline to inquire into the facts upon which the Secretary of the Treasury based his proclamation involved in the case at bar.

With respect to the statement in the proclamation here involved with reference to the pound sterling, "Obligation to sell gold at legal monetary par suspended, effective Sept. 21, 1931," we do not think that this should be held as contradicting the statement that gold was the legal standard of Great Britain and that the value of the pound sterling, in terms of United States money, was $4.8665.

In the case of Hadden v. Merritt, 115 U.S. 25, 5 S.Ct. 1169, 1170, 29 L.Ed. 333, the question of the value of the Mexican dollar (a silver coin) in United States money was involved. The Secretary of

the Treasury had issued a proclamation estimating the value of the Mexican dollar at $1.01⅚₀. The importer sought to prove that this proclaimed value was upon the basis of the value of the Mexican dollar compared with the United States silver dollar, and it was contended by him that the comparison should have been with the United States gold dollar. Evidence with respect to this claim was excluded by the trial court, and the Supreme Court approved the ruling. The latter court in its opinion stated: "The value of foreign coins, as ascertained by the estimate of the director of the mint and proclaimed by the secretary of the treasury, is conclusive upon custom-house officers and importers. No errors alleged to exist in the estimate, resulting from any cause, can be shown in a judicial proceeding, to affect the rights of the government or individuals. There is no value, and can be none, in such coins, except as thus ascertained; and the duty of ascertaining and declaring their value, cast upon the treasury department, is the performance of an executive function, requiring skill, and the exercise of judgment and discretion, which precludes judicial inquiry into the correctness of the decision. If any error, in adopting a wrong standard, rule, or mode of computation, or in any other way, is alleged to have been committed, there is but one method of correction. That is to appeal to the department itself. To permit judicial inquiry in any case is to open a matter for repeated decision, which the statute evidently intended should be annually settled by public authority; and there is not, as is assumed in the argument of the plaintiff in error, any such positive and peremptory rule of valuation prescribed in the statute, as serves to limit the discretion of the treasury department in making its published estimate, or would enable a court to correct an alleged mistake or miscalculation. The whole subject is confided by the law exclusively to the jurisdiction of the executive officers charged with the duty; and their action cannot be otherwise questioned."

The case of United States v. Klingenberg, 153 U.S. 93, 14 S.Ct. 790, 38 L.Ed. 647, relied upon by appellant, involved a proclamation of the Secretary of the Treasury estimating the value of the standard coins of Austria. Said proclamation, in a tabulation and footnote, set forth the following:

Standard-Silver*

| Monetary unit and value in terms of U. S. gold dollar | Florin | Gold | .48,2 |
| | | Silver | .32 |

| Coins | Gold: | 4 florins ($1.92,9) |
| | | 8 florins ($3.85,8) |
| | | ducat ($2.28,7) |
| | | 4 ducats ($9.15,8) |
| | Silver: | 1 and 2 florins |

Footnote: *Silver, the nominal standard. Paper the actual standard, the depreciation of which is measured by the gold standard.

The Supreme Court in its opinion, with respect to the conclusiveness of the secretary's proclamation, expressly affirmed its former holdings in the cases of Cramer v. Arthur, supra, and Hadden v. Merritt, supra, but held that by reason of the footnote, together with the body of the proclamation, the value of the gold florin as stated therein was the proper basis to be used in arriving at the value of the paper florins in which the merchandise there involved was invoiced.

It will be observed that the footnote there involved was not at all analogous to the notation in the proclamation here involved, under the heading of "Remarks," and therefore we do not consider the ruling in that case with respect to the effect of said footnote as applicable to the case at bar.

The case of United States v. Whitridge, 197 U.S. 135, 25 S.Ct. 406, 49 L.Ed. 696, also relied upon by appellant, involved the construction of a proviso contained in section 25 of the act of August 27, 1894, 28 Stat. 509, 552, which proviso is not contained in section 522 of the Tariff Act of 1930 here involved. The said proviso was eliminated from said section 25 of the Act of August 27, 1894, by an amendment approved May 27, 1921, 42 Stat. 17. As neither the said proviso nor any provision similar thereto exists in the present law, we do not consider that the decision in United States v. Whitridge, supra, has any bearing upon the question here before us.

Appellant's contention is based upon the claim that the equivalent of the pound sterling in gold is no longer a standard coin in Great Britain, and is, in fact, no longer in circulation in that country.

We think that said contention is an effort, in effect, to impeach the accuracy of the proclamation of the Secretary of the Treasury. By that proclamation the sec-

retary found the existence of a foreign standard coin and the value thereof in United States money. Upon that finding the amount of duties assessable in the case at bar were computed.

It is our opinion that, under the authority of the cases of Cramer v. Arthur, supra, and Hadden v. Merritt, supra, the correctness of the findings set forth in said proclamation may not be inquired into by either the collector or the courts, and that the collector was bound to accept such findings in computing the duties here involved.

We find no error in the decision of the Customs Court, and its judgment here appealed from is affirmed.

Affirmed.