EGRY REGISTER CO. *v.* UNITED STATES

No. 4690.—Invoice dated Toronto, Canada, July 2, 1937.
Entered at Dayton, Ohio, July 19, 1937.
Entry No. 23.

(Decided December 14, 1939)

*Toulmin & Toulmin* (*H. A. Toulmin, H. A. Toulmin, Jr.,* and *Rowan A. Greer,* of counsel) for the plaintiff.

*Webster J. Oliver,* Assistant Attorney General (*Samuel D. Spector,* special attorney), for the defendant.

DALLINGER, Judge: This appeal to reappraisement involves the question of the dutiable value of a certain unfinished printing machine and unfinished miscellaneous parts of printing machines imported from Canada and entered at Dayton, a subport of the port of Cleveland, Ohio, in July 1937. The machine was invoiced and entered at $6,000. and the parts at $500. The appraiser advanced the value from $6,500. to $18,437.74 on the basis of the alleged cost of production.

It appears from the evidence that on January 5, 1937, F. M. Scudds, Ltd., of Toronto, Canada, entered into three identical contracts with the plaintiff corporation, photostatic copies of which are annexed to the report of Treasury Representative Bunting in evidence herein as Exhibit 9. Each contract called for the manufacture, sale, and delivery of one rotary offset press at a price of $11,666 f. o. b. Dayton, Ohio, the duty, sales tax, and other taxes imposed by the Canadian, United States, or State Governments to be paid by the seller. Each contract provided that payment should be made by the purchaser as follows: $2,000. on the signing of the contract; $4,000. on the date of acceptance of the press; $1,666. 30 days from said acceptance; and the balance, $4,000, 60 days from the date of said acceptance.

On January 5, 1937, the plaintiff corporation wrote to the Toronto branch of the Bank of Montreal as follows:

This is to advise you that we have entered into contract with F. M. Scudds Limited of your city for the construction of three special machines and as stipulated in the terms of the contract, we are advancing the sum of $2,000 on each of these machines, or a total advance payment of $6,000.

In accordance with the foregoing, are enclosing herewith three checks for $2,000 each, payable to the order of F. M. Scudds Limited and endorsed by them for deposit. They will draw against this deposit for material and labor used exclusively on this contract as referred to in the foregoing. While the total contract is in the neighborhood of $35,000, the contract provides only for the advance payment of $6,000.

They have expressed their willingness to supply you with vouchers covering the items labor and material used applying on this contract and withdrawals from the aforesaid deposit.

In compliance with this letter F. M. Scudds, Ltd., submitted to the Bank of Montreal monthly statements purporting to cover expenditures made on account of the Egry Register Co. contracts as follows: January, $2,013.41; February, $2,061.73; and March, $2,127.94.

On May 8, 1937, S. Tourkow, foreign sales manager of the plaintiff corporation, wrote a letter to F. M. Scudds, Ltd., instructing the latter to keep a separate payroll book in which all labor used exclusively for the construction of the plaintiff's machines should be recorded, a copy of which letter, together with all the invoices for materials, to be submitted each week to Mr. Gabell, managing director of the Egry Register Co., Ltd., of Canada. As matter of fact, however, the record discloses that neither before nor after the receipt of this letter did F. M. Scudds, Ltd., keep such a separate payroll book. The only payroll books found in the hands of the receiver of F. M. Scudds, Ltd., and in evidence herein, are exhibits N–1, N–2, and N–3 attached to the special agent's report of October 23, 1937, and admitted in evidence herein as Collective Exhibit 9, and they apparently cover all of the labor employed for all purposes in the factory of said Canadian company.

No machines having been delivered to the plaintiff corporation in accordance with the contracts, Elmer Rauh, vice president of the plaintiff corporation, went to Toronto and visited the factory of F. M. Scudds, Ltd., where he discovered that one machine had been partially completed, and that practically nothing had been done on the other two machines. He also discovered that evidently money advanced by his company had been expended upon work other than the machines in question, F. M. Scudds, Ltd., having been in financial difficulties which had resulted in the appointment of a receiver.

He then decided that under the circumstances he had better obtain possession of the unfinished machine and the material in the factory which had been acquired for the manufacture of the other two machines, and have them shipped to the United States.

After Mr. Rauh's return from Canada, Sam Tourkow, foreign sales manager of the plaintiff corporation, was instructed to go to Toronto and arrange for the clearing of the unfinished machine and the unfin-

ished parts of the other machines through the customs. Accordingly, he had a conversation with a Mr. Wright of F. M. Scudds, Ltd., relative to a fair price for the uncompleted machine and the material or unassembled parts of the other machines. Mr. Wright admitted that his company would have received under the contract for the delivery of a completed machine f. o. b. Dayton, Ohio, after deducting transportation charges, taxes, duty, etc., the sum of $8,500., and that it would cost the plaintiff corporation between $2,500. and $3,000. to complete it. Accordingly, Wright agreed that the actual value of the machine in its uncompleted condition was $6,000. and he gave Mr. Tourkow a receipted invoice for that amount. It was also agreed that the unfinished parts of the other machines were only worth the value of the cast iron in them, and that $500. would be a fair price for the same, and Wright gave Tourkow a receipted invoice for that amount.

Accordingly, upon shipment to the United States the plaintiff corporation entered the merchandise at $6,500. The appraiser, however, advanced the value to $18,437.74 on the basis of the cost of production of said merchandise. It appears from the record that the appraiser's action was based upon information contained in reports of the special agent who visited Toronto and examined the books of the F. M. Scudds, Ltd. (then in the hands of a receiver), wherein appeared the amounts advanced by the plaintiff corporation and alleged to have been expended for labor and materials on the machines in question. These books are in evidence herein, but unfortunately, as already stated, the time books cover all of the labor expended by F. M. Scudds, Ltd., in their factory, there being no segregation of the labor performed on the unfinished machine designed for the plaintiff herein.

It is true that there is also a statement in an affidavit attached to one of the special agents' reports (Collective Exhibit 11) by S. L. Wright that $14,837.86 was a correct statement of the cost of labor and materials expended on account of the Egry Register Co. contracts; and also a statement in an affidavit attached to the same report by Francis M. Scudds of F. M. Scudds, Ltd., that the uncompleted machine hereinbefore referred to could have been completed without much additional expense, and also that some work had been done on the other machines.

In view, however, of the fact that the record shows that money advanced by the plaintiff corporation had been applied to work other than the plaintiff's machines, it is evident that said Wright and said Scudds might well have felt it necessary to protect themselves from possible legal action by the plaintiff, and that their testimony ought not to be given any probative value.

While the appraiser, in taking the cost of production as the basis of value in the instant case, evidently followed the strict letter of the statutory definitions of value contained in section 402 of the Tariff Act of 1930 and recent decisions of the United States Court of Customs and Patent Appeals construing the same, and is not to be criticized for his action, nevertheless, in my opinion, the finding of a value of $18,437.74 for this merchandise is unconscionable; and I do not believe that it was ever the intention of the Congress to apply cost of production to an importation of this kind.

The entered value of the merchandise herein was arrived at by negotiation between the importer and the representative of the seller, and the agreed upon value of the said merchandise in the condition in which it was actually imported represented the fair market value of the same.

The unfinished machine and the involved parts herein are utterly unlike any ordinary commodities, such as textiles, metals, food products, or any other article of general merchandise. By its very nature the importation herein was entirely incapable of being offered for sale to all purchasers in the usual wholesale quantity and in the ordinary course of trade in the principal markets of the country of exportation, as is any ordinary article of merchandise as aptly pointed out by Brown, Judge, in the recent case of *Automatic Totalisators, Inc.* v. *United States*, decided June 15, 1939, Reap. Dec. 4604. I am in hearty accord with the following statement made by the learned judge in that case:

The reason why such individual specially constructed purchases are now claimed to be appraisable upon "cost of production", with their purchase price ignored in finding customs value, seems to be based upon the erroneous assumption that when in the acts of 1922 and 1930 Congress sought to procure more customs duty, in addition to raising the rates, by dividing foreign-market value into home consumption value and export value and providing that the importer should pay duty upon whichever was higher, Congress was also incidentally relegating all such specially constructed articles to appraisement on "cost of production," for the first time.

Some modern appraisements relegating them to cost of production since the act of 1922 rest primarily upon the expression in all customs definitions reading "freely offered for sale to all purchasers." Yet that expression has been in the law for a century or more. It was taken from the language used by the Supreme Court in the famous old champagne case.

\* \* \* \* \* \* \*

Those words are inserted in customs value definitions to insure that the importer of an article of general consumption does not get it appraised on importation at a value at which he luckily *purchased below the market* for usual purchasers of such freely sold goods. They naturally have no application whatever to an isolated, specially constructed article such as this. There the importer cannot get it in below the market for the entire market consists of his purchase alone.

\* \* \* \* \* \* \*

Cost of production was properly considered usable only when there were no sales whatever anywhere when the merchandise was consigned for use in his home or factory by the importing consignee. It never was an accurate value, or even professed to be, but merely a method with arbitrary statutory additions constructively for approximating foreign-market value when no sales or offers of sale abroad or here were available to be used for determining customs value. If its use is now to be expanded to cover a new and large class of articles like the article before us that is going to add enormously to the difficulties and uncertainties of foreign trade. This radical change was very far from the thought of Congress when it simply divided up foreign value into two parts and provided that duty should be paid upon whichever part was higher. The effect of the change should be limited to its expressed purpose and the old expressions repeated in the new change should not be used for making appraisements in a large class of new importations by cost of production as if it were a substantive value definition instead of a mere dernier resort when all sales and offers to sell either here or abroad were completely lacking.

It is perfectly plain to the writer that now as under the former acts Congress intended the negotiated purchase price of articles made under circumstances like these to measure the ad valorem duties.

The merchandise which was the subject of the above-cited case was a so-called totalisator, imported from Australia, manufactured according to special specifications peculiar to the American betting system, no similar machine ever having been imported to America before or since.

Many such specially constructed articles under the old definitions of home-market value in the Tariff Act of 1913 and previous acts were appraised upon their purchase price both by administrative customs officials and by the courts. Among such cases the learned judge cites the following: *United States* v. *Niagara Ammonia Co., Inc.,* Dec. 312 Volume of Reappraisement circulars covering January-December 1926, page 245; *Receivers of the Central Vermont Railway Co.* v. *United States,* T. D. 44257, 58 Treas. Dec. 286; *Lloyd Co.* v. *United States,* 9 Ct. Cust. Appls. 283, T. D. 38217; *United States* v. *Glendinning McLeish & Co., Inc.,* 12 Ct. Cust. Appls. 222, T. D. 40229; *M. J. Corbett & Co., Inc.* v. *United States,* T. D. 45965, 62 Treas. Dec. 418, 20 C. C. P. A. 178.

In *Ziade* v. *United States,* 14 Ct. Cust. Appls. 47, T. D. 41551, the appellate court reversed a decision of the Board of General Appraisers (now this court) and held that the invoice value based upon the actual cost of production, as in the instant case, was evidence of foreign value of certain lace goods. The court there said:

It having been established that the relationship of buyer and seller existed between the importer and the firm of Ziade & Morai, and that the importer purchased the imported merchandise at prices based upon the cost of production, which prices were stated in the invoices and included in the entries, the importer was entitled to a finding by the general appraiser, *there being no other legal evidence of foreign values, that the invoice prices represented the foreign values of the merchandise.* *Lloyd Co.* v. *United States,* 9 Ct. Cust. Appls. 280, T. D. 38217; *United States* v. *Bloomingdale,* 10 Ct. Cust. Appls. 149, T. D. 38400; *United States* v. *Sabin,* 12 Ct. Cust. Appls. 521, T. D. 40731. [Italics mine.]

To say the very least, the plaintiff in this case was the victim of sharp practice on the part of the foreign manufacturer. Not only was the uncompleted machine in question the only one of its kind in existence, but it was in such a condition that it required a large expenditure of money by the importer to make it in any way serviceable. It, as well as the unfinished parts that had been intended for the other two machines, to any other purchaser would have been nothing but junk.

As stated by the expert accountant employed by the importer herein, and as is plainly evident from the entire record in the case, it is absolutely impossible to ascertain the separate items of labor and materials which entered into either the uncompleted machine or the unfinished parts of the other two machines. Under these circumstances, the ascertainment of a fair-market value for the uncompleted machine by subtracting from the amount which the foreign manufacturer would have received if the machine had been completed according to contract specifications, the estimated amount which it would cost the importer to complete the machine, was a most equitable method of determining its value. The same thing is true of the unfinished parts of the other two machines.

In my opinion, the invoice and entered price fairly represents the value of the imported merchandise as thus determined.

On the other hand, the finding by the appraiser of a value of $18,437.74 based on the alleged cost of production of the imported merchandise, as shown by the very questionable books of the foreign manufacturer and by the statements of the latter and of his factory manager made to the Treasury agents in order to protect themselves against possible legal action by the importers for misrepresentation and false entries, leads in my opinion, as I have already stated, to an unconscionable result.

In the case of *Gottlieb Cramer* v. *Chester A. Arthur, Collector of the Port of New York*, 102 U. S. 612, the Supreme Court of the United States in a unanimous decision said:

* * * It was the object of this law (Revised Statutes Sec. 2838) to compel the parties to show in the invoices, the actual prices and cost of their goods, in the currency of the country where bought, and not leave it to them to make a pretended estimate of the cost in a coin valuation. It is true, the government is not bound by the invoice, but may have the value of the goods appraised. R. S., secs. 2904, 2907. *Nevertheless, such invoices, exhibiting the actual transactions, and capable of being verified by oath, are essential instrumentalities in the prevention of fraud; and, in the absence of suspicious circumstances, usually furnish the basis for estimating the actual values of the goods.* * * * [Italics mine.]

Therefore, upon the established facts and the law applicable thereto, I find the export value of the uncompleted machine and of the unfinished parts of the other two machines in question to be the invoiced and entered values thereof.

Judgment will be rendered accordingly.