(C. D. 1196)

HESTON & Co. *v.* UNITED STATES

## United States Customs Court, First Division

(Decided December 9, 1949)

*Tompkins & Tompkins (Allerton deC. Tompkins* of counsel) for the plaintiff.

*David N. Edelstein,* Assistant Attorney General (*Samuel D. Spector* and *Richard E. FitzGibbon,* special attorneys), for the defendant.

Before OLIVER, COLE, and MOLLISON, Judges; MOLLISON, J., concurring

COLE, Judge: This classification case was assigned to me, to hear or to hear and determine while on circuit, by the chief judge, pursuant to the authority vested in him under the statute governing this court, 28 U. S. C. (1948 revision) §254 (formerly section 518 of the Tariff Act of 1930, 28 U. S. C. 1946 ed. §296). My views set forth in *Geo. S. Bush & Co., Inc., et al.* v. *United States,* 22 Cust. Ct. 158, C. D. 1175, questioning the jurisdiction of the division to decide a case somewhat similar to these proceedings, continue as the minority expression from the division. Under the practice and procedure of the court and the rules applicable thereto, much litigation before the court is dependent upon my participation in a decision of the same. Adhering, however, to my views expressed in the *Bush* case, *supra,* but for the purpose of expediting the work of the court, I am preparing this opinion and participating in the decision and the judgment accompanying the same.

Plaintiff imported at the port of Philadelphia one hundred bales of wool, described on the invoice as "Greasy New Zealand Combing Wool." It was classified under paragraph 1102 (b) of the Tariff Act of 1930 (19 U. S. C. §1001, par. 1102 (b)), as wool in the grease, not specially provided for, and assessed with duty at 34 cents per pound of clean content.

Before liquidation, and while the merchandise was in bonded warehouse, the importer, acting under authority of section 562 of the Tariff Act of 1930, as amended by the Customs Administrative Act of 1938 (19 U. S. C. §1562), had the merchandise graded under customs supervision by a commercial grader, who repacked the wool, after manipulation, into 128 bags. He reported their contents as follows:

| | |
|---|---|
| 15 bags (Nos. 46001–46015) | 46s or finer than 44s |
| 112 bags (Nos. 44001–44112) | not finer than 44s |
| 1 bag (No. 40001) | not finer than 40s |

Following receipt of this report, the customs officials made further examination of the wool. Seventeen bags were ordered to the public stores where an examination by the customs examiner resulted in this report:

Respectfully returned with report that the one bag, #40001, which was marked as 40s. after manipulation, was found upon examination to contain more than 40% of fleeces grade 44s. and would be advisorily classified as wool not finer than 44s. at 17¢ per lb. of clean content under paragraph 1102 (a) on the original

laboratory report of 74.0% cc. The balance of the bales were found to contain more than 10% of wools of 46s. grade and finer which are properly dutiable under paragraph 1102 (b). [Exhibit 3.]

In liquidation, the original classification was adhered to and all of the merchandise was assessed with duty under paragraph 1102 (b), *supra*, on the basis of 74 per centum clean content.

Plaintiff urges that the finding of the commercial grader should be accepted as the proper basis for tariff classification. In doing so, the protest has been abandoned so far as it relates to the 15 bags (Nos. 46001–46015) found to contain wool finer than 44s, but pressed as to 113 bags out of the 128 that were compiled, the contention being that 112 bags (Nos. 44001–44112) should be classified as not finer than 44s, dutiable at 17 cents per pound of clean content under paragraph 1102 (a) of the Tariff Act of 1930 (19 U. S. C. § 1001, par. 1102 (a)), as modified by the trade agreements with Argentina and Uruguay, 77 Treas. Dec. 138, T. D. 50504, and 78 Treas. Dec. 169, T. D. 50786, respectively, and one bag (No. 40001) as not finer than 40s, dutiable under paragraph 1101 (a), as modified, *supra*, at 13 cents per pound of clean content.

The paragraphs referred to read as follows:

PAR. 1102. (a)   Wools, not specially provided for, not finer than 44s, in the grease or washed,   *   *   *: *Provided*, That a tolerance of not more than 10 per centum of wools not finer than 46s may be allowed in each bale or package of wools imported as not finer than 44s.

PAR. 1101. (a)   *   *   *   wools of whatever blood or origin not finer than 40s; *   *   *   *Provided*, That a tolerance of not more than 10 per centum of wools not finer than 44s may be allowed in each bale or package of wools imported as not finer than 40s.

The issue presented is primarily one of grading, the particular question being which of the two methods, the Government's or the commercial grader's, shall prevail. We shall determine this and furnish our reasons therefor.

Paragraph 1101 (5) of the Tariff Act of 1930 (19 U. S. C. § 1001, par. 1101 (5)) provides that "the Official Standards of the United States for grades of wool as established by the Secretary of Agriculture on June 18, 1926, pursuant to law, shall be the standards for determining the grade of wools."

Under statutory authority, the Secretary of Agriculture was also directed to acquire and diffuse among the people of the United States "useful information relative to the standardization, grading, preparation for market, marketing, utilization, transportation, handling, and distribution of wool, and of approved methods and practices relative thereto," and permitted promulgation of "such rules and regulations as he deems advisable for carrying out any of the provisions of this Act," 45 Stat. 593–594, entitled "An Act to authorize the appropria-

tion for use by the Secretary of Agriculture of certain funds for wool standards, and for other purposes."

There is in evidence "Service and Regulatory Announcements No. 135," issued September 1932, and Amendment No. 2 thereof, issued in November 1942, defendant's collective exhibit 4, being the public notices promulgated by the Department of Agriculture under statutory authority, *supra*, setting forth the official United States wool standards and instructions for determining the grade of wool. Said regulations, as they relate to the present issues, are:

### OFFICIAL STANDARDS OF THE UNITED STATES FOR GRADES OF WOOL AND WOOL TOP

\*　　\*　　\*　　\*　　\*　　\*　　\*

SEC. 9. Grade 46's, or low one-fourth blood.

(a) 46's shall be wool which in diameter of fiber is greater than the sample marked "48's" but not greater than the sample marked "46's" of a series of samples in the custody of the United States Department of Agriculture in the District of Columbia in a container marked "Original official standards of the United States for grades of wool."

\*　　\*　　\*　　\*　　\*　　\*　　\*

SEC. 10. Grade 44's, or common.

(a) 44's shall be wool which in diameter of fiber is greater than the sample marked "46's" but not greater than the sample marked "44's" of a series of samples in the custody of the United States Department of Agriculture in the District of Columbia in a container marked "Original official standards of the United States for grades of wool."

\*　　\*　　\*　　\*　　\*　　\*　　\*

SEC. 11. Grade 40's, or braid.

(a) 40's shall be wool which in diameter of fiber is greater than the sample marked "44's" but not greater than the sample marked "40's" of a series of samples in the custody of the United States Department of Agriculture in the District of Columbia in a container marked "Original official standards of the United States for grades of wool."

"Practical forms of the official standards of the United States for grades of wool　\*　\*　\*　certified under the seal of the United States Department of Agriculture and under the signature of the Secretary of Agriculture,　\*　\*　\*　will be furnished to any person requesting the same," subject to conditions set forth in the "Service and Regulatory Announcements No. 135," *supra*.

Determination of grades "40's," "44's," and "46's" shall be by the "Inspection Method," which "shall be by visual comparison with practical forms of the Official Standards of the United States for Grades of Wool; *Provided*, that for any individual fleece the grade shall be determined by comparison of the fibers of predominant fineness found therein with said practical forms of the Official Standards." Amendment No. 2 to Service and Regulatory Announcements No. 135, *supra*.

All of the testimony in the record was offered by Government officials and commercial witnesses, two of whom were employees of the

commercial grader whose action is claimed to be the proper basis for classification. All of the witnesses were called by the plaintiff. The writer of this opinion personally presided over most of this trial and had an opportunity, therefore, to see and observe the witnesses. Their qualifications and the testimony given are easily accepted as sufficient for us to feel that the issues herein have been clearly and ably presented by witnesses long associated with and well qualified to discuss the subject before us.

We review, first, the testimony of witnesses associated with the Department of Agriculture, who explained the origin and preparation of the official standards, and the so-called "practical forms."

Frank Grayson testified that he has been a wool grader for approximately 50 years, and that he was employed by the Department of Agriculture from 1920 to 1942, except for a short period during 1925 and 1926 when he was associated with Texas A & M College, educating students and wool growers in the matter of preparing and marketing wool. He, as the only wool specialist connected with said Department, assisted in the preparation of the specimens selected from domestic wools submitted by wool growers and manufacturers, as type samples, and established as the United States official standards for grading wool, plaintiff's exhibit 8.

From 1930 to 1942, he prepared sets of "practical forms," exhibit 7, which are replicas of the official standards. An examination of said exhibit discloses that it consists of swatches of wool, varying in size and ranging in grade from 36s to 80s. They are mounted on velvet-covered boards, approximately 18 inches long and 12 inches wide. Three grades, properly identified, are displayed on a board, the entire set comprising four boards.

The "practical forms" are prepared by matching, for character (feel and softness) and fineness of fibers, the comparable domestic wool with the official standards. Grade determination is based upon the spinning properties of fibers. All fibers within a definite grade are not of the same fineness. A grade designation is indicative of fibers within a certain range. In other words, there is a spread of fineness in each particular grade. For example, grade 44s displayed on exhibit 7, *supra*, shows the lowest fineness permissible in the grade which would extend to the low edge of the next grade above, i. e., 46s. The difference in grade number implies a difference in the fibers of predominant fineness; the lower the grade number, the coarser and longer the fibers of predominant fineness.

The "practical forms" were prepared with knowledge they would be used largely in grading operations dealing with foreign wool. Although New Zealand wool is superior to domestic wool, both in length of staple and uniformity of character, the same types of fibers exist in the respective grades of both, so in a grading operation there would

be no difference between the foreign and domestic. The "practical forms" are sent, upon request, to customs officials for their official use, and to other interested individuals and organizations, including wool growers and various colleges.

Every fleece of wool contains various grades and, in stapling for grade, the staples are drawn "from the side behind the shoulder" where the fibers of predominent fineness are to be found. No two wool graders will grade wool alike, and it is quite possible when a fleece "gets so close on the line of a grade," one might call it 44s and another 46s. The distinction between the two grades of wool is found in the general characteristics, particular attention being directed to the uniformity of crimpness, length of staple, and fineness of fibers.

Referring generally to the grading of wool, the witness testified that practical experience is essential and that visual examination is important in determining the general characteristics of wool. In fact, the witness was of the definite opinion that it is not possible for customs officials to use the "practical forms" unless they have had considerable experience in grading, because "An inexperienced person hasn't had knowledge of the actual grading itself, would have an awful difficult job and it would be an extended time in using the government standards." The job would not be satisfactory "unless he was an expert." Although the witness later testified that the only knowledge needed to make a physical comparison between any staple of wool and the official standards was "decent eye sight," his testimony, read as a whole, shows that in making such statement he had reference to an individual sample and not to a practical grading operation.

The supervisor of standardization work in the wool division of the Department of Agriculture testified that the official standards are maintained under his supervision and are kept under seal at all times. They consist of swatches of wool mounted on a black board, enclosed in a case, with a glass front. The case is approximately 5 feet long, 3 feet wide, by 3 or 4 inches thick. The swatches vary in size, depending upon the grade of wool that is represented, the finer wool being approximately 2 inches in length and the coarser extending to about 1 foot. The width in each instance is about 2 inches.

The "practical forms" are duplicates of the official standards, made up of domestic wool that is not part of the batch from which the standards are prepared. Sets of "practical forms" are arranged by a qualified wool grader who determines the grades used therein by comparing them with the official standards.

A market specialist, employed in the wool section of the livestock branch of the Department of Agriculture, offered no testimony, but merely produced copies of the regulations, collective exhibit 4, *supra*.

Counsel for plaintiff, in their brief, attack the use of the "practical

forms" as duplicates of the official standards. It is argued, from testimony in the record, that the wools used in each display of grades do not come from the same source, that no attempt is made to get identical micrometer count, and that the "practical forms," compared only by visual comparison through a sealed glass case, "contain only what the grader in the Department of Agriculture personally believes through his wool grading experience is a fair representation of the original." The contention is answered in *United States* v. *American Express Co. et al.*, 177 Fed. 735, a case which arose under the Tariff Act of 1897. There, the collector had classified certain wool in accordance with an official sample, established pursuant to statutory authority. The importer claimed that the sample, used as the guide by customs officials, was not truly representative of the wool it purported to be, but that it was of an inferior class. In upholding the validity of the official sample, the court said:

Congress having delegated to the executive department of the government full authority to establish standards under the broad terms of the statute expressive of merino wool, immediate or remote, coupled with an express statutory declaration that such standards shall be the standards for classification, the question whether a regulation standard operates unjustly, oppressively, or disproportionately with reference to other classifications and values, and whether relief should be granted, are questions addressing themselves to that branch of the government to which the authority was fully delegated, rather than to the courts.

The "practical forms" of wool were used not only by the customs officials, but also were referred to by the commercial grader, in examining the wool under consideration. They are issued under the seal and signature of the official designated by statute and are distributed under regulations promulgated pursuant to law. Until the Secretary of Agriculture declares otherwise, the "practical forms" have the same value in grading wool as the official standards, and they are so considered herein.

The assistant chief of tariff classification in the Bureau of Customs, whose duties include consideration of matters relating to the tariff classification of wool and who was instrumental in having the "practical forms" distributed to customs officials, produced two Treasury Department circulars that were sent to all customs officers, for their guidance in the examination of wool for grade, Bureau of Customs Circular Letter No. 2451, dated April 25, 1944, plaintiff's exhibit 5, and Customs Information Exchange circular 347/44 of July 17, 1944, plaintiff's exhibit 6. Both communications carried instructions to the effect that in grading wool the fleece shall be regarded as the unit, and that grade determination shall be based on the bulk or predominant fineness of the fibers in the fleece. A paragraph from exhibit 6, *supra*, is quoted:

The term "the bulk or predominant fineness" in the light of the facts outlined, can only refer to the predominant combination of fibers, according to the propor-

tion within each diameter range, contained in the major part of the fleece, in most instances, in the whole fleece. In those instances where a fleece contains two or more grades of wool in such quantities, or of such character, as to preclude the blending of the fleece into one standard grade, as in the case of some cross-breds, the grade of the larger part of the fleece will control the grade of the fleece.

Following receipt of exhibits 5 and 6, *supra*, counsel for plaintiff made the following concession:

At this point, I would like to state and go on record as making no claim that certain regulations currently in force by the Bureau of Customs are unwarranted. In other words, we concede the validity of the regulations insofar as they relate to the method for determining the percentage of a different grade of wool in a bale of wool in the fleece. In other words, the regulations currently in effect, and I will attempt to establish this by my witness, the regulations currently in effect, hold that if one has a bale of grade 44 fleeces, and there is contained in that bale less than ten percent of grade 46 fleeces, the whole bale should be classified as 44's. Now, in that respect, we do not challenge in any way the existing customs regulations and we concede that those are quite appropriate and proper.

Official examination of the shipment in question was made by a customs examiner, Philip W. Kerley, whose 12 years' experience in grading wool has been confined to his capacity as a customs official, he never having graded wool as a commercial proposition. The following comes from his testimony.

New Zealand wool, the product under consideration, is rather loosely packed in bales weighing approximately 300 pounds, each bale containing between 55 and 60 fleeces. The grades of wool in different fleeces are never the same. Coarser fibers appear at the britch or lower end and on the belly. Finer fibers are through the center and on the shoulders and neck. Determination of the grade of a fleece is based upon the predominant fineness of the fibers therein.

Seven bales of the importation were sent to the appraiser's stores where the original official examination, prior to the manipulation by the commercial grader, was made. To get the best light, which is important for examining wool, the bales were lined up along the windows, where the "opener and packer cuts three sides of the top of the bales so he can leave the fleeces out and the fleeces are laid on the work benches." All the fleeces in each of the bales were examined. Staples of wool were drawn from all parts of the fleece, i. e., "shoulders, britch, belly, sides, and down the back—all around." Each staple was laid beside "the official standards just the same as the official standards lay in the box keeping it the same where the tip is in the box down to the flesh side." The center portion of the staple was accepted as giving the average diameter of the staple, with about $1\frac{1}{2}$ inches from each end being disregarded in the grade determination. He explained his procedure as follows:

* * * So that we get a representative staple from all parts of the fleece—take 15 staples, maybe 20—no certain amount you draw. You figure when you got a representative number of staples which we lay besides the boards, for the official

standards for grades of wool as furnished by the Department of Agriculture. In this case, the wool was entered as grade 44's. If we lay a staple besides a 44, and we find it is not better than 44, we throw it in the 44's. If we find it is better than the 44, then we put it in the 46's. If, when we are finished, if we have 8 staples on the 46's and 4 on the 44 side, we consider a predominant finding of that fleece is 46's, so we go on and continue with each fleece. If, when we get finished we have more than 10 percent of the fleeces on the 46 pile, we consider the bale as a unit 46.

The conclusion reached in grading a fleece is based entirely upon a visual comparison of the extracted staples with the official standards, without any technical knowledge of fiber construction. The procedure followed in this case is the same as that always pursued throughout the witness' experience.

The manipulation by the commercial grader of the wool under consideration was done in a bonded warehouse, under customs supervision, and in accordance with prevailing regulations. The witness, however, was not present during any part of the grading operation. Following receipt of the commercial grader's report, 17 bags were ordered to the public stores and examined by the same method as that followed with the 7 bales in the original examination, except that every fleece in all the bags was not graded. When it was found that a bag exceeded the 10 per centum tolerance allowed for grade 44s classification, no further examination was made. It will be observed that of the 17 bags, the grade determination of 1 bag was different from that found on the original examination, as stated in the examiner's report (exhibit 3), *supra*.

The customs employee, John E. Sullivan, who assisted in the official grading operations of the wool in question, testified that he had approximately 1½ years' experience in examining wool, all of it in his official capacity. Government counsel admitted "He is not a grader; he just grades," and conceded "he is no expert." The witness stated that he selected staples from the fleeces and put them alongside the standards, and compared them, without disregarding any part of the staples, but concentrating on the central portion as most representative. The explanation reveals some inconsistency in the procedure followed by the two customs officials; one gave no consideration to approximately 1½ inches from each end of the extracted staple, and the other disregarded no part of them.

The witness was present part of the time while the commercial grader made his examination. It was "either the first or the second day" of the grading operation. His purpose was "to show them how the fleeces would be graded in the customhouse here by the Government and to see if they were making any real mistakes so we could get them set on the real path." He had with him a set of the "practical forms" and noticed that the commercial grader also had a set. As the fleeces were graded, they were thrown into three piles, representative of grades 40s, 44s, and 46s.

No records were kept by the customs officials to show the number of fleeces contained in each bale or bag, the amount actually examined, or any other details concerning their official grading operations. The examination was considered sufficient when the contents of a unit (bale or bag) exceeded the 10 per centum allowance, which would be "Nine or ten in a bale, at least."

The commercial grader who actually graded the wool in question testified to 27 years' experience as a wool grader and sorter, having started as an apprentice boy and worked continuously in the wool trade. Wool grading is largely a matter of practical experience through which "the eye becomes accustomed to the different grades you have to take out." For an accurate grade determination, wool should be graded from the tip, or the weather side, which always contains the lower grade of a fleece. The procedure was followed in examining the present merchandise and if it was possible to determine at a glance that the grade was finer than either 44s or 40s, no stapling was done. If, however, there was doubt about its grade, the fleece was opened and staples withdrawn, usually from the sides and back where the fibers of predominant fineness are to be found. The staples were examined throughout "from the tip to the end," and the conclusion formed the basis for determining the bulk of the fleeces. Each of the fleeces contained different grades. Hence, classification of a fleece does not mean that every fiber therein is of the grade within which the whole is graded, but rather that the fibers of predominant fineness are of the designated category.

In the particular job under consideration, which extended as has been said, over a period of 5 or 6 days, a customs official was present during the first day of the grading operation. "He came in at that time to examine some of the fleeces. There was not much said about it. He didn't tell me what I had to do when he went there so I went on with my job and finished the job." When the work was begun, and in the presence of the customs official, comparison was made between several of the imported fleeces and the "practical forms," "so we were sure we started off right." Thereafter, the witness relied on his mental picture of the various grades, except for an occasional reference to them "toward the end of the day or beginning of the day, I would take a look at them to refresh my mind a little bit."

The New Zealand wool in question is a low grade, cross-bred wool. It was not tightly packed so it was possible to get an idea about the grade as the fleeces were thrown upon the grading board, which was placed against the window to get the benefit of plenty of natural light. As the wool was bundled or rolled, the flesh side or better grade of wool was exposed. It was rolled in different ways. Some fleeces started with the britch, or coarsest end, and were rolled to the neck, where the finest fibers are located. Others were rolled from the neck down and

a few were rolled on the sides. In some instances, it was necessary to give the fleece a couple of turns to get an over-all picture of it. Examination was made of every fleece in all of the 100 imported bales, each one consisting of approximately 35 fleeces, individually weighing 8 or 9 pounds. The result, set forth in plaintiff's exhibit 1, shows 112 bags to be 44s, 15 bags to be 46s, and 1 bag to be 40s.

The supervisor of the commercial grading of this wool testified that the method followed is the same as that consistently used throughout his 50 years' experience as a wool sorter and grader. The important phase of his testimony is the emphasis on the fact that fibers of predominant fineness control grade classification of wool, and that the weather side is determinative of the grade.

Two additional commercial witnesses offered testimony that was directed entirely to a general practice for grading wool. Neither of them had anything to do with any of the grading operations of the present merchandise.

The record has been reviewed in considerable detail because it has developed the question before us to be purely one of fact.

Government counsel, in their brief, stress the failure of the commercial grader to use the official standards for each and every fleece he examined, and argue that the work he did was "at best * * * a poor job." The record, however, does not support such a characterization.

It is clear from the proof adduced herein that the commercial grader recognized the official "practical forms" as guides for his grading operation, and so employed them. When he began his work, he used them in comparison with several of the imported fleeces in the presence of the customs official who was there to observe and to see that the Government's method was followed. Then, too, he referred to the official standards throughout the course of his grading operation to refresh himself on the various grades. The sufficiency of such an examination is supported by testimony of the commercial grader, as well as by the Department of Agriculture's expert grader, who assisted in formulating the official standards and was responsible for the preparation of the "practical forms." Both witnesses emphasized the great importance, if not indispensability, of practical experience, particularly in ascertaining the fibers of predominant fineness, and the value of the "trained eye" in grading wool. Both factors are most essential in making grade determination.

The weight of the evidence herein is favorable to plaintiff's contention and establishes that the grades of wool included in the importation in question are those as claimed. Accordingly, the different grades, and their proportionate amounts, as found by the commercial

grader are held to prevail for tariff purposes. We therefore hold that bag No. 40001 contains wool not finer than 40s, classifiable under paragraph 1101 (a), as modified, *supra*, and dutiable at 13 cents per pound of clean content, and that bags 44001 to 44112, inclusive, contain wool not finer than 44s, classifiable under paragraph 1102 (a), as modified, *supra*, dutiable at 17 cents per pound of clean content; all of said merchandise to be assessed on a basis of 74 per centum clean content, as found by the collector and conceded to be correct by plaintiff.

The protest, having been abandoned as it relates to the wool contained in bags 46001 to 46015, inclusive, is dismissed so far as it concerns that merchandise.

To the extent indicated, the protest is sustained and judgment will be rendered accordingly.

### CONCURRING OPINION

MOLLISON, Judge: I concur in the decision and judgment rendered by my colleagues in this case. It is apparent that the difference in result obtained by the customs examiner from that obtained by the commercial grader in this instance came about by reason of the use of two different methods of determining the "fibers of predominant fineness" found in any given fleece. The term "fibers of predominant fineness" appears in the amended regulations of the Secretary of Agriculture under the caption "Methods for Determining the Grade of Wool."

The customs examiner determined the fibers of predominant fineness by opening up each fleece and taking from 12 to 20 staples from all over the fleece, i. e., "shoulders, britch, belly, sides, and down the back—all around." Each of those staples was compared with the official practical forms, and the predominant fineness found in the staples determined the grade of the fleece.

The commercial grader, on the other hand, graded the fleeces first, by examining them as they came rolled up, and from his experience judged from the flesh side of the fleece the fineness of the wool. In those cases where he found it necessary to withdraw staples, he took them from the back or sides, and not from all around, for the reason that in his experience the fibers of predominant fineness were to be found on the sides and back of the fleeces.

There does not appear to be any question but that in any given fleece fibers of varying grades will be found. It is the uncontradicted testimony of qualified witnesses that the fibers found in the neck, shoulders, and belly or skirts of a fleece will generally be finer than those found on the back and sides of the fleece, and that the fibers

found on the hocks and britch of the fleece will generally be coarser than those found on the back and sides, which appear to be the major portion of the fleece.

Obviously, the method followed by the customs examiner would result in the inclusion in the determination of fibers of predominant fineness fibers taken from parts of the fleece which are consistently finer or coarser than those in the areas where the characteristic or uniform fibers of the fleece are found, i. e., the back and sides. The Government method, therefore, would be an "averaging" method of all the fibers found in all areas of the fleece. It is easily seen, moreover, that if the back and sides constituted one-half or more of the area of a fleece and yet contributed less than one-half of the staples to be compared, a disproportion of fibers other than the characteristic fibers of the fleece would be involved in the result.

It will be noted that the "Inspection Method" for determining the grade of wool contained in the regulations of the Secretary of Agriculture, which method was intended to form the basis of the examination by both the customs officers and the commercial grader, provides—

* * * that for any individual fleece the grade shall be determined by a comparison of the fibers of predominant fineness found therein with said practical forms of the Official Standards.

An "averaging" method would not necessarily determine the fibers of predominant fineness in the fleece, but merely the average fineness of the fibers in the fleece, and would be only more or less accurate even in that respect, depending upon the proportion of the staples withdrawn to the areas from which they were withdrawn. On the other hand, the method followed by the commercial grader appears to have been a practical, as well as a literal, compliance with the aforesaid regulations.